IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2009 Session

## KEITH M. FARNHAM v. DONNA M. FARNHAM

**Appeal from the Chancery Court for Knox County**
**No. 168799-3     Michael W. Moyers, Chancellor**

**No. E2008-02243-COA-R3-CV  - FILED DECEMBER 29, 2009**

Keith M. Farnham ("Husband") filed a complaint in the trial court seeking a divorce from Donna M. Farnham ("Wife"). In a separate filing, he sought to have the parties' 17-year marriage declared void *ab initio*. The trial court denied the motion. Following a bench trial, the court dismissed Husband's complaint and granted Wife's counterclaim for divorce on the ground of inappropriate marital conduct. The court incorporated the parties' agreed parenting plan with respect to their two minor children, distributed the marital property, and awarded Wife periodic alimony. Husband appeals. He essentially challenges the trial court's main decrees. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Douglas R. Beier, Morristown, Tennessee, for the appellant, Keith M. Farnham.

Anne Greer, Knoxville, Tennessee, for the appellee, Donna M. Farnham.

### OPINION

#### I.

Husband and Wife were married on August 10, 1990, in the state of Florida. After living in Florida and later in Massachusetts, they came to Tennessee where they subsequently separated in August 2006. Two sons were born to this marriage – Clarke in May 1992 and Connor in November 1994. Husband filed his complaint for divorce in January 2007.[1] The parties stipulated that Wife

---

[1]This proceeding will be referred to as being in the "trial court" to avoid confusion with the Massachusetts proceeding.

had grounds for divorce. Five months after filing his complaint, Husband moved the court to declare the parties' marriage void *ab initio*.

Testimony from the parties showed that they met in December 1989 while they were living in Pittsfield, Massachusetts. Wife was legally separated from her first husband and was in the process of obtaining a divorce, a fact she immediately made known to her future spouse. The parties' relationship developed and they eventually made plans to get married once Wife's divorce was final. In June 1990, the parties moved from Massachusetts to Florida where they applied for a marriage license. Wife explained that they applied for the license then because her divorce hearing was set for that same month and they assumed the divorce proceedings would soon be concluded. Both Husband and Wife recalled that Wife had informed the official in Florida who issued the license of Wife's pending divorce. They were advised that it was all right to apply for the license because they were only filling out the necessary paperwork and weren't going to be married that day. Wife explained that she listed her maiden name on the application based on her order of legal separation that provided she was restored to its use.

Wife's Massachusetts divorce case was continued until August 1990 at which time the court conducted a hearing with the parties and their attorneys in attendance. Wife testified in the trial court that at the end of the Massachusetts hearing, the judge announced to the parties that their divorce was granted. She said when she inquired about "the divorce papers," the judge and her attorney advised her that she would "be getting the actual papers in the mail within 30 days." Wife returned to Florida that same night and told Husband she was divorced. Husband believed her, having no reason to believe otherwise. Wife understood that her divorce was granted and believed she was free to marry. Out of an abundance of caution, the parties contacted the Florida court clerk's office and notified them that Wife had had her hearing, and that the judge had granted her a divorce, but that she had not yet received "the papers." Wife testified they were advised that she did not need the court papers and there was no "waiting period" in Florida.

The parties were married in Florida on August 10, 1990, the day before their marriage license expired. Wife said she "absolutely" believed she was legally divorced when she and Husband married. Husband agreed that, prior to initiating divorce proceedings in the present case, he had no doubt in his mind that he and Wife were legally married. After their marriage in Florida, the parties continued to reside in that state until they later returned to Wife's home state of Massachusetts in 1995 where they thereafter lived for two years. They briefly returned to Florida before moving to Tennessee, where they continued to live together as husband and wife until the separation that led to the filing of the complaint in the trial court.

In the trial court, Husband introduced a certified copy of the preliminary Massachusetts divorce order. It was signed on August 6, 1990, and provided, in part, that the "judgment of divorce nisi shall be entered 30 days from the date hereof." The certified copy further reflected that a

judgment of divorce nisi was entered on September 6, 1990.[2]  Wife reiterated that she had not received any papers at the time of the Massachusetts divorce hearing in August 1990.  She again explained that she thought she was divorced when she married Husband.  At the conclusion of the hearing below, the trial court denied Husband's motion to declare the marriage void and the case continued.

At the time of the August 2008 bench trial in the trial court, Husband was 41, Wife was 51, and their sons were 16 and 13, respectively.[3]  Husband had recently taken a new job at Molecular Pathology Laboratories as a technician.  His monthly gross income was $5,151.  Husband had left his previous employment with Trane, Inc., because of better hours with his new employer.  He stated that although his hourly pay rate had increased, he was not eligible to work as much overtime and therefore was earning $700 a month less in his new job.  Wife had an associate degree in business management, but had not worked for the past ten years.  Before she married Husband, she had begun receiving social security disability benefits.  Early in the marriage, she had worked part-time or on a temporary basis, but her medical condition[4] had worsened and she stopped working outside the home.  Wife's only source of income was her disability benefit of $1,135 per month.  In addition, she received social security benefits for the children and child support from Husband.  Husband stated his opinion that Wife had the ability to pursue gainful employment and work outside the home.

The parties stipulated that Wife would retain possession of the marital home.  They also stipulated that each party would receive the vehicle that the party drove, as well as the furniture and furnishings in the party's possession.  Wife agreed that her adult son from her previous marriage had been living with her and contributing $50 per week to Wife's household expenses.  By the time of the hearing below, however, her son had moved out on his own and no longer contributed toward Wife's expenses.  Husband was living with his "paramour" and her two children and paid half of their monthly household expenses.

At the conclusion of the trial, the court awarded Wife the marital home and the majority of the other marital assets.  The marital debt was allocated primarily to Husband.  In addition, Wife was awarded permanent alimony of $800 per month.  The trial court expressly found that the alimony award was based on Wife's need for periodic alimony and Husband's ability to pay.  On August 20, 2008, Husband moved the court to reconsider its judgment based on his assertion that he had been terminated from his new employment and was presently unemployed. The trial court denied the motion and entered its judgment of absolute divorce.  Husband filed a timely notice of appeal.

II.

---

[2]Although the certified copy of the order also contains spaces for the date that the judgment of divorce absolute was entered and for the trial court's signature, those spaces are not filled in.

[3]A transcript of the trial is not included in the appellate record.  Instead, the parties have submitted a joint statement of the evidence, approved by the trial court pursuant to Tenn. R. App. P. 24(c).

[4]The record does not further disclose the nature or extent of Wife's disability.

Husband raises the following issues on appeal:

> 1. The trial court erred in finding that the parties' marriage was not void *ab initio*.
>
> 2. The trial court erred in its division of the marital assets and debts.
>
> 3. The trial court erred in awarding Wife alimony.

### III.

Our review of the trial court's findings of fact is de novo upon the record of the proceedings below, accompanied by a presumption of correctness as to those findings, a presumption we must honor unless the preponderance of the evidence is against those findings. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995); **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993). There is no presumption of correctness regarding the trial court's conclusions of law. **Kendrick v. Shoemake**, 90 S.W.3d 566, 569 (Tenn. 2002); **Campbell v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996).

The issues raised on appeal with respect to division of property and alimony involve subjects addressed to the sound discretion of the trial court. **Batson v. Batson**, 769 S.W.2d 849, 850 (Tenn. Ct. App. 1988); **Fisher v. Fisher**, 648 S.W.2d 244, 246 (Tenn. 1983); **Aaron v. Aaron**, 909 S.W.2d 408, 410 (Tenn. 1995). "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." **State v. Shuck**, 953 S.W.2d 662, 669 (Tenn. 1997) (citing **Ballard v. Herzke**, 924 S.W.2d 652, 661 (Tenn. 1996)).

### IV.

Husband contends that the trial court erred in denying his motion to declare the parties' marriage void from its inception. Husband asserts that the marriage is bigamous, and, under the public policy of this state, cannot be recognized. Wife responds that the marriage is valid under the laws of Florida and Massachusetts and therefore should be recognized in Tennessee.

In upholding the marriage, the trial court found, in relevant part, as follows:

> It is uncontradicted that the parties were married on August 10th, 1990. It also seems uncontradicted that the final decree of divorce was not entered in Massachusetts until September 6th, 1990, rendering the August 10th marriage, at least technically, bigamous, although there is absolutely no evidence in the record to suggest that either party knew at the time that they entered into the marriage that [Wife's] divorce was not final or that their marriage was bigamous.

The defendants have argued that under Florida law, under circumstances similar to this, Florida recognizes the concept of marriage by estoppel, even in cases where the original marriage was, at least technically, bigamous. The defendants have also cited Massachusetts state law that states that if parties marry under a disability and that disability is removed during the term of the marriage and the parties take up residence in the state of Massachusetts and hold themselves out as husband and wife, then the state of Massachusetts will recognize the marriage as valid and legal.

The state of Tennessee explicitly does not recognize marriage by estoppel . . . if the underlying marriage is considered to be bigamous; that is the Guzman case. However, the court recognizes the fact that there are some differences between Guzman and the current circumstance. There is no evidence – there is nothing that we can take from Guzman to suggest that the problem with the Guzman marriage which made it bigamist was ever corrected either by the state of Tennessee or any other state. That is not the case here.

Guzman also . . . takes a great deal of effort in talking about public policy of this state. As the defendants point out, to prosecute parties for bigamy in the state of Tennessee requires a showing that the bigamous relationship was entered into knowingly. While this court understands that the public policy of the state is to prevent bigamy and is not to recognize bigamous relationships, the court can hardly conceive of how that public policy is advanced by invalidating a long-term marriage that was entered into in good faith by both parties, neither of whom had any reason to believe or suspect that . . . entering into their marriage was bigamous.

Because of that, the court finds that there are substantial differences between this case and the Guzman case, finds that the public policy of the state would not be significantly advanced by declaring this marriage to be void. The court finds that this marriage was – at the very least, the disability in this marriage was cured when the parties lived in Massachusetts under the statute that rendered their technically-invalid marriage valid.

And the court recognizes that under the full faith and credit laws of the Constitution the State of Tennessee should and ought recognize marriages that would be considered legal in other states when they are brought into the state of Tennessee, and therefore, the motion to declare the marriage void is denied.

The trial court correctly found that the parties' marriage was "technically bigamous." Massachusetts law generally provides that in actions for no-fault divorce, a judgment of divorce nisi shall enter thirty days after the trial court's approval of the parties' dissolution agreement. *See* Mass. Ann. Laws 208 § 1(A). In turn, a judgment nisi "shall become absolute after the expiration of ninety days from the entry thereof, unless the court within said period . . . otherwise orders." Mass. Ann. Laws 208 § 21. A combined reading of these statutes demonstrates that Wife's divorce was not final until 90 days after the September 6, 1990, judgment nisi was entered, or December 5, 1990. This leads us to consider whether the trial court properly found that a valid marriage nonetheless existed under Florida law, Massachusetts law, or both.

It has long been generally held that "a marriage valid where celebrated is valid everywhere." ***Pennegar v. State***, 87 Tenn. 244, 248, 10 S.W. 305 (1888). As noted, in the instant case, the parties were married in Florida. The law of Florida is that a marriage is not valid if one of the parties has a legal spouse at the time of the marriage. ***Lopes v. Lopes***, 852 So.2d 402, 403 (Fla. 5th DCA 2003)(citing ***Jones v. Jones***, 119 Fla. 824, 161 So. 836 (1935) (providing that the "marriage of a man and woman, where one of them has a husband or wife by a prior marriage, who is then living and undivorced, is generally held to be absolutely void, and not merely voidable, and, being a nullity, no judicial decree is necessary to avoid same.")). Florida courts have, however, applied the doctrine of equitable estoppel to find the existence of a marriage, even in the face of a bigamous, void union, where necessary to prevent a great injustice.

Whether estoppel would apply in the context of an allegedly void marriage was directly at issue in ***Keller v. Keller***, 521 So.2d 273 (Fla. 5th DCA 1988). The facts in that case were that husband married his first wife in 1946. In 1964, he traveled to Mexico to obtain a divorce decree. Soon after, Husband and his second wife entered into what would be a lengthy marriage. Upon their divorce, Husband appealed the dissolution agreement. He argued that no award of marital property or spousal support was proper in view of his claim that the marriage was void *ab initio*. En route to its conclusion that the trial court correctly found a marriage by estoppel, the Florida Court of Appeals observed:

> [T]he trial court found that [the wife] did not take any part in the procurement of the Mexican divorce, and there was nothing in the record to indicate that even if she knew of the divorce, that she had any reason to know that it was not effective. The parties in the instant case were married approximately 20 years, with no allegation of the marriage being void until a claim was made for alimony and property by the wife in the dissolution proceeding. The trial court's determination that [the husband] should be estopped from raising this defense was proper and, thus, affirmed. *See also **Seoane v. Seoane***, 514 So.2d 430 (Fla. 3d DCA 1987); ***Arnold v. Arnold***, 500 So.2d 739 (Fla. 3d DCA 1987).

(Bracketed material added.)

In support of her claim of a marriage by estoppel under Florida law, Wife particularly relies on ***Lambertini v. Lambertini***, 655 So.2d 142 (Fla. 3d DCA 1995). In that case, the wife married her first husband in Chile. Two years later, they separated and the wife moved to Argentina where she met Mr. Lambertini and they eventually moved in together. The wife and Mr. Lambertini retained a Mexican attorney who obtained documents for them by which wife was purportedly divorced from her first husband and married to Mr. Lambertini. In the ensuing years, two daughters were born to the couple. In addition, at some point, the wife's first husband had their marriage annulled. The Lambertinis immigrated to the United States in 1968 where they continued to live together until Mrs. Lambertini petitioned for divorce in 1992. In answer to her petition, Mr. Lambertini asserted that their Mexican marriage was invalid. Notwithstanding its finding that the parties' marriage was of "doubtful validity," the trial court held that Mr. Lambertini was equitably estopped from challenging it as void *ab initio*. ***Id***. at 143. Husband moved for a rehearing based on new evidence obtained from Mexican officials that certified the non-existence of the marriage. On revisiting the matter, the court concluded (1) that it lacked subject matter jurisdiction, (2) terminated its award of support and alimony to the wife, and (3) granted an annulment. ***Id***. In reversing the judgment, the Florida Court of Appeals stated:

> The presumption of a marriage's existence grows out of long and continuous cohabitation, the establishment and maintenance of a home and family, and recognition by the public generally and their friends and associates that the man and woman are husband and wife. The strength of that presumption increases with the passage of time during which the parties are cohabiting as husband and wife. The presumption of validity of the marriage in the instant case is a strong one, regardless of the dispute whether the Mexican marriage was void ab initio. The parties cohabited and held themselves out to family, friends, and to the public as married for approximately thirty years, bore and raised two children within this time, and held property as tenants by entirety. At final hearing the husband testified that he had honestly believed and reasonably relied on the validity of the marriage to the wife for some thirty years. There was no allegation by either party that the marriage was void until the wife made her claim for alimony in the dissolution proceedings. For these reasons the husband was equitably estopped from raising the validity of the marriage, and annulment was improper.
>
> Each party also claims that the other was the active procurer of the invalid Mexican marriage. However, there is no evidentiary support in the record for the argument that one of the parties is innocent while the other is necessarily culpable. Apparently, by focusing on the claimed invalidity of the Mexican divorce and marriage, the trial court misapprehended that both parties may have been duped by the unprofessional misrepresentations of the Buenos Aires attorney who procured the putative marriage certification. There is no record evidence of any fraudulent conduct by either of the parties. Both

-7-

parties participated in procuring the so-called divorce and marriage from the Argentine attorney, and there is nothing in the evidence to indicate that either party had reason to believe that the Mexican divorce and marriage were not valid.

*Id*. at 143-44. (Internal citations omitted.)

In *Keller, Lambertini*, and other cases cited therein involving factual circumstances similar to those in the present case, Florida courts have found the existence of a valid marriage that is otherwise void for bigamy where it would be inequitable to allow a party to argue that the marriage was void. In short, Florida case law holds that "[a] party to a dissolution proceeding may be estopped from asserting that the marriage is bigamous and void." *Wright v. Wright*, 778 So.2d 352, 354 (Fla. 2d DCA 2001)(citing *Lambert v. Lambert*, 524 So. 2d 686 (Fla. 4th DCA 1988); *Keller*, 521 So. 2d 273)). Of course, "[w]hether an estoppel defense applies depends upon the facts of the case." *Id*. We think it clear that given the facts of the present case, Florida courts would apply the doctrine to prevent Husband from challenging the validity of the parties' 17-year marriage for the first time in connection with wife's claim for alimony in the divorce proceeding he initiated. In the present case, the trial court acknowledged, and in our view, implicitly accepted Wife's contention that the parties' marriage is valid in the state of Florida under the concept of marriage by estoppel. We agree with the trial court's view of Florida law and we also agree with the trial court's decreed result when that law is applied to the facts of this case.

The trial court expressly found that the marriage was also valid under Massachusetts law. Again, the proof showed that in 1995 the parties moved to Massachusetts and lived there for about two years before relocating back to Florida. Wife contends that the fact of their residency in Massachusetts during this time as husband and wife served to validate their marriage by operation of Massachusetts law. She points to Mass. Ann. Laws 207 § 6, which provides as follows:

> If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief that the former husband or wife was dead, that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed by the death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be considered as the legitimate issue of both parents.

The Massachusetts Supreme Judicial Court has explained the remedial nature of the statute:

> While one of the objects of the statute is to protect persons who enter into the marriage relation in good faith, the broad general purpose of the statute is to provide against illegitimacy of children and to protect the public interests. Its purpose is to provide that the marriage ceremony, illegal at first by reason of the existence of an impediment, shall be regarded as taking place at the time the impediment is removed and as covering all marital relations thereafter assumed in good faith.

*Turner v. Turner*, 189 Mass. 373, 375 (1905). Applying the statute to the present case, the trial court found that the parties' marriage became valid "at the very least" when they lived in Massachusetts after Wife's divorce became final. Husband asserts, however, that the statute does not apply to the present case based on the decision of the Massachusetts Supreme Judicial Court in *Commonwealth v. Stevens*, 196 Mass. 280, 82 N.E. 33 (1907). That case involved a defendant's criminal prosecution for bigamy. The defendant obtained a divorce from his first wife by decree nisi in Massachusetts, but, before the judgment became absolute, moved to Georgia and married his second wife. The second wife had no knowledge of the impediment to the marriage. The couple remained in Georgia during the time that Husband's divorce decree became final and later returned to Massachusetts. Polygamy charges were brought after the defendant then married a third woman on the ground that he was still married to his second wife. The trial court rejected the State's argument that the savings statute applied to validate the Georgia marriage, thus resulting in a polygamous third marriage in Massachusetts. The judgment was affirmed. On appeal, the *Stevens* Court explained that the savings statute had no extraterritorial force – "it applies only to cases where, upon the removal of the impediment, it could instantly take effect." *Id*. at 284. Because the parties were living in Georgia when the impediment to their marriage was removed, the statute did not apply to validate the marriage. Instead, the Court applied a Georgia criminal statute to the Georgia marriage and held the marriage void. The defendant's polygamy conviction was thus reversed.

Returning to the present case, Husband relies on *Stevens* to argue that the savings statute likewise cannot apply to validate the parties' Florida marriage since the parties were still living in Florida when the impediment to their marriage was removed. The transcript of the motion hearing does not reflect that the parties or the trial court discussed *Stevens*. Clearly, however, the trial court found that when the parties lived together in Massachusetts, the savings statute operated to validate going back to the date that wife's final divorce decree was entered. Despite the holding in *Stevens*, we think the trial court was correct. *Stevens* is distinguishable on a number of grounds, not the least of which is that it was a criminal case. The stated policy concerns underlying the statute, particularly the protection of parties that enter into marriages in good faith and the children born of those unions, were not present in *Stevens*. Perhaps most significantly, it is by virtue of Massachusetts law that the parties' Florida marriage is "technically bigamous." We think it only makes sense to apply another Massachusetts statute specifically directed at the very type of circumstances presented here, to validate the parties' marriage. Other jurisdictions faced with the question of whether the Massachusetts remedial statute should be applied to validate an otherwise void and bigamous marriage have held to the same effect. *See Arcand v. Fleming*, 185 F. Supp. 22 (D. Conn. 1960); *Russo v. Art Steel Co.*, 21 A.D.2d 942 (1964).

In *Russo*, the issue on appeal was "whether a marriage performed in New York at a time when one of the parties cannot enter into a valid marriage contract under the laws of the Commonwealth of Massachusetts can be validated by section 6 of chapter 207 of the Massachusetts General Laws, when the parties live together as husband and wife in good faith after the impediment has been removed." 21 A.D. at 942. In answering in the affirmative, a supreme court in New York stated:

> We believe that we should give full recognition to the above-quoted section in relation to the foreign divorce decree being construed. We feel that the Massachusetts statute has extraterritorial effect and can be applied to parties who are married and live outside of Massachusetts. Such recognition is consistent with giving full faith and credit to the interlocutory nature of the foreign decree. (*See Arcand v. Flemming*, 185 F. Supp. 22.) The Massachusetts statute is remedial in nature and should be applied for its intended purpose of protecting persons who marry innocently in good faith and to avoid the stigma of illegitimacy for innocent children when one parent is blameless of any conscious violation of the marriage laws (*Arcand v. Flemming*, *supra*, and cases cited).

*Id*.

Based on the foregoing, we agree with the trial court's conclusion that the marriage was valid under both Florida and Massachusetts law. The question becomes whether the marriage should be recognized in Tennessee. As the trial court put it, "the heart of the matter here, is whether or not that problem [of Wife's undissolved first marriage] was cured such that Tennessee should recognize this marriage now." On hearing the motion to declare the marriage void, the trial court questioned Husband's counsel along these lines:

> The Court: [I]f the marriage were recognizable under Florida law or Massachusetts law, why would Tennessee not continue, as it does in common law marriages, to recognize this marriage?
>
> Counsel: Well, Florida law does not recognize the common law marriage.
>
> The Court: But it does recognize – at least it's been argued, recognize marriage by estoppel – under circumstances similar to the ones that we have before us. If this proceeding were being held in Florida and if Florida would recognize a marriage by estoppel under these circumstances, should Tennessee not also recognize the marriage by estoppel under the circumstances?
>
> Counsel: Well, I think that they ought to go to Florida and litigate it down there.

* * *

> The Court: Tennessee does recognize marriages from other states that could not be entered into in the state of Tennessee. And there is at least one case . . . that says when you're looking to the validity of the marriage you look at the laws of the state wherein was contracted. So even though [the] state legislature has set forth rules that one must follow if one is to get married in the state of Tennessee, the state does recognize and the courts of the state do recognize . . . marriages that could not be legally contracted in the state of Tennessee but have been legally contracted to in other states.
>
> Counsel: But the other side of that coin is not only does the other state set up a procedure and the requirements for a marriage, it also sets out the procedure and the requirements for a divorce.
>
> The Court: But if the states make provision for the curing of technically deficient marriages, should the state of Tennessee recognize those provisions as well?
>
> Counsel: If it is cured, then it is just like the regular marriage. But this particular thing was not cured.
>
> The Court: Why was it not cured? Either by the fact that if I accept the defendant's argument the state of Florida would recognize marriage by estoppel under these circumstances or the fact that they lived in Massachusetts for a while after [Wife's first] marriage ended, after the disability was removed, and the state of Massachusetts has a provision that says that if you get married with a disability and it's removed and you hold yourself out to be husband and wife in the state, your marriage would be recognized?

As discussed, we conclude that the trial court correctly found the parties' marriage valid under Florida law, through the doctrine of equitable estoppel, and under Massachusetts law, by operation of that state's remedial statute. As to the former, we do not believe that the Tennessee Supreme Court's decision in *Guzman v. Alvares*, 205 S.W.3d 375 (Tenn. 2006), relied upon by Husband, demands that the parties' marriage be held void in this state.

In *Guzman*, the parties were married in Mexico under the belief that Ms. Guzman's Mexican divorce from her first husband was final. Although her former husband had been granted a divorce at the trial court level in April 1986, the case went to the Supreme Court of Jalisco (Mexico) on automatic review. That court did not enter its judgment confirming the divorce until March 1987. Two expert witnesses testified that, under Mexican law, the divorce was not final under Mexican law until the Jalisco Supreme Court had entered its decree. In the interim, Ms. Guzman and Mr. Alvares were married in August 1986. The couple moved to Tennessee, had four children together, and lived

-11-

as a married couple until Wife sought a divorce in 2002 on grounds of adultery, inappropriate marital conduct, and irreconcilable differences. At the trial, the proof showed that Wife was never served with the final divorce decree from her first marriage and she testified she did not know of the circumstances surrounding her divorce until Mr. Alvarez filed his answer and counterclaimed for annulment based on her subsisting first marriage. The trial court found a marriage by estoppel, granted Ms. Guzman a divorce, divided the marital estate, and ordered Mr. Alvarez to pay child support.

On appeal, this court affirmed the judgment except with regard to the property division. On second-tier appellate review, the Supreme Court reversed our judgment. Noting that there was no evidence presented that the parties ever entered into a lawful marriage after Ms. Guzman's divorce became final, the Court concluded that Mr. Alvarez had established that the parties' marriage was bigamous and void. In considering whether marriage by estoppel would apply, the court further observed: "When one of the parties to the purported marriage seeks to invoke the doctrine of marriage by estoppel in a case against the other party to the marriage, this Court has refused to apply the doctrine when the parties entered into a bigamous marriage, regardless of either party's knowledge of the impediment." *Id*. at 380-81 (citing *Pewitt v. Pewitt*, 192 Tenn. 227, 240 S.W.2d 521, 526-28 (Tenn. 1951)). In short, the *Guzman* Court held that "the applicable statutes, our prior case law, and the public policy of this state prohibit the application of the marriage by estoppel doctrine to void, bigamous marriages." *Id*. Husband insists that Guzman's holding applies to prevent the parties' Florida marriage by estoppel from being recognized in this state. We disagree. The overriding problem with the "marriage" at issue in *Guzman* was that there was no evidence that it was ever recognized as valid as a marriage by estoppel or under any other theory of Mexican law. Stated differently, the validity of the marriage in *Guzman* was entirely dependent on the application of Tennessee law and, as the Supreme Court observed, Tennessee does not permit a marriage by estoppel in the case of a void, bigamous marriage. For these reasons, the Tennessee Supreme Court refused to apply principles of estoppel to validate a marriage that was void under the laws of the jurisdiction where it was entered into. To the contrary, the present case involves a marriage that is recognized as valid under Florida law, where it was celebrated, as well as Massachusetts law, where the parties also lived together as husband and wife. In our view, the trial court properly gave full faith and credit to the laws of our sister states. In our view, there is no question that under the circumstances of this case, the trial court properly found that the parties' 17-year union was a valid marriage recognizable as such in Tennessee.

V.

Husband takes issue with the trial court's division of the marital property. He submits that, basically, Wife received all the assets while he received all of the debt. He concludes that this is simply not an equitable result.

Dividing marital property is not a mechanical process but rather is guided by carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c)(2005)[5]. *Flannary v. Flannary*, 121 S.W.3d 647, 650-51 (Tenn. 2003); *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). As previously noted herein, trial courts have broad discretion in fashioning an equitable division of marital property. *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004); *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983), and appellate courts must accord great weight to a trial court's division of marital property, *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). It is not this court's role to tweak the manner in which a trial court has divided the marital property. *Morton v. Morton*, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005). Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the evidence preponderates against the trial court's division of the marital property. *Jolly*, 130 S.W.3d at 785-86.

In this case, all of the property at issue was undisputedly marital property subject to being equitably divided and distributed between the parties. As we noted earlier, much of the parties' personal property, including the vehicle each party drove, and the furniture, furnishings, and fixtures

---

[5]The statute sets out the relevant factors as follows:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

in each party's possession, was awarded pursuant to the parties' pre-trial stipulations. The record contains no evidence as to the value of any of these assets.

The trial court was essentially left to distribute five remaining marital assets – the equity in the marital home, Husband's Trane, Inc., 401(k) stock account and pension fund, a 2007 income tax refund, and a 2008 stimulus check. As we have noted, the parties bought the home in 2004 for $189,500. At the time of the trial below, the mortgage balance was $172,000, and the monthly payment was $1,160. Husband valued the home at $200,000, while Wife believed it was worth $190,000. The trial court awarded the home to Wife free of any claims of Husband but did not assign a value to the equity that Wife thereby received. For purposes of our analysis and in fairness to Husband, we use the property value assigned by Husband and calculate Wife's award of home equity at the higher value of $28,000. In summary, the trial court divided the marital assets as follows:

| Asset | Value | Awarded to Wife | Awarded to Husband |
|-------|-------|------------------|---------------------|
| Equity in marital home | $28,000 | $28,000 | $ |
| Trane 401(k) stock account | 10,246 | 10,246 | |
| Trane pension fund | 9,494 | 9,494 | |
| 2007 Tax refund check | 1,456[6] | 1,456 | |
| 2008 Stimulus check | 1,800[7] | 1,200 | 600 |
| Total | $50,996 | $50,396 | $ 600 |

The trial court stated that its final divorce judgment was based on the pleadings, the testimony at the trial and the "record at large." The court did not, however, make specific findings of fact regarding the factors it considered in its division of the marital property. In the absence of findings of fact by a trial court regarding the relevant statutory factors, an appellate court must conduct its "own independent review of the record to determine where the preponderance of the evidence lies." *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). Turning to Section 36-4-121(c), we first consider that this was a lengthy marriage of nearly 18 years. In our view, this factor would support a more equal division of the assets, as would Husband's and Wife's respective contributions to the marriage and its assets as wage-earner and homemaker respectively. Other factors including age, physical disability, employability, earning capacity, and financial need, however, would favor a greater award to Wife than Husband considering that Wife is ten years older, disabled, has not worked outside the home in over ten years, has no apparent ability to improve her economic circumstances, and has primary responsibility for raising the parties' two teenaged sons. The record does not reflect that either party brought any notable assets to the

[6]The proof showed that the parties received a check in the amount of $579.60; Wife testified that the remaining $877of the refund due was withheld by Child Support Services to satisfy a child support arrearage that Husband owed to Wife.

[7]The proof showed that the parties actually received a check in the amount of $900; the additional $900 was withheld to cover Wife's student loan debts. However, Wife testified that her student loan payment was deducted from her disability benefit each month and that she had been assured by the proper authorities that she would be receiving the balance of the full stimulus check.

marriage or has any separate property to speak of. Lastly, with the award of the house to her, Wife assumed full responsibility for the mortgage payment. According to her income and expense statement, the house payment exceed her monthly income and, at the time of the divorce, she was experiencing a monthly shortfall of over $2,300. In our view, the overall equities between the parties supports a disproportionate award of the marital property to Wife. In short, we conclude that the trial court did not abuse its discretion in its division of the marital property.

Marital debts are subject to equitable division in the same manner as marital property. *See* *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). In dividing marital debts, courts should consider the following factors: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Id*. The trial court set out the ten debts in question within the divorce decree but did not list the amount of each debt or their combined total. They appear to include outstanding bills owed to health or dental service providers, three mobile telephone companies, a utility district, a bank, and a cable/internet service company. At the trial, Husband contended that some of those debts should be allocated solely to Wife because, according to Husband, Wife incurred some in his name during their separation and recklessly allowed others to be incurred. Wife admitted to the debts but offered explanations of their origins and purpose. Wife further testified that she had borrowed $4,000 from her brother to make the mortgage payments on the marital home during the pendency of the divorce.

Again, without making specific findings regarding the amount of the marital debt or the factors it considered relevant, the trial court allocated responsibility for the payment of the marital debt solely to Husband with the exception of one, additional doctor's bill for $583 that was divided equally between the parties. According to Husband, the bills he was ordered to pay total $5,569 compared to the one $291 debt assigned to Wife. There is scant evidence regarding the debts in the record before us, particularly regarding which party incurred or benefitted from the debt. In our view, however, it is clear that Husband is better able to repay them particularly considering that Wife's income is fixed and her expense statement indicates that she is unable to pay her regular monthly bills while Husband has the demonstrated ability to earn over $60,000 a year. The evidence does not preponderate against a finding that Husband should be burdened with most of the marital debts, even if some were incurred by Wife during the parties' separation.

VI.

Husband challenges the award of permanent alimony to Wife as an abuse of discretion. He essentially contends that the evidence does not support such an award based on a consideration of Wife's need and his ability to pay. More specifically, Husband argues that considering that Wife was not allocated any of the parties' marital debt and has a "consistent disability income," no award of spousal support is justified.

Tenn. Code Ann. § 36-5-121(d)(2005), the statute governing alimony, states a preference, "whenever possible," for an award of rehabilitative alimony to an economically disadvantaged spouse. However, "[w]here there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, . . . then the court may grant an order for payment

of support and maintenance on a long-term basis. . . ." *Id*. Thus, long-term spousal support is intended to provide long-term support to an economically disadvantaged spouse who is unable to be rehabilitated. *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2004); *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App.1997). The amount, if any, and type of alimony to be awarded is within the sound discretion of the trial court in view of the particular circumstances of the case and a consideration of the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)(1-12). Those factors are:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Among the cited factors, the "real need of the [disadvantaged] spouse seeking the support is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." *Aaron v. Aaron*, 909 S.W.2d at 410.

In the present case, the trial court expressly cited its finding of Wife's need and Husband's ability to pay in fashioning its award of alimony *in futuro* of $800 a month to Wife. The evidence does not preponderate against the trial court's finding. The proof showed that, on the basis of an unspecified medical condition, Wife had been deemed disabled by the federal government and began

-16-

receiving social security disability benefits even before she and Husband married. According to her testimony, Wife had worked part-time early in the marriage, but her condition had worsened and she had not worked outside the home during the last ten years. While Husband contended that Wife had the ability to obtain gainful employment, there was no evidence to support this contention. The proof further showed that Wife's only source of income, excluding child support and the children's social security benefits, was her disability check of $1,135.67 a month. Wife's income and expense statement reflected that she was nearly $2,000 short of funds each month. In summary, Wife was 51 years old, disabled, had not been employed in over 10 years, and there was no indication that her future financial situation was likely to improve. Although Wife was awarded the marital home, she was burdened with a mortgage debt which was more than her entire monthly disability check.

Husband, on the other hand, had recently taken a position with better hours that resulted in a pay cut of $700 a month. Even so, Husband's monthly salary at the time of the trial was $5,151 – still significantly more than Wife's monthly income. While Husband asserts that Wife's expense statement was "inflated and speculative," we observe Husband's statement included a payment of a $600 on the marital home, for which he will no longer be responsible, as well as $500 a month to his attorney and $400 in monthly "transportation" expenses over and above his car payment. Husband correctly notes that Wife was awarded the bulk of the marital assets, while he was allocated the majority of the debts. We do not agree, however, that this property division somehow removes Wife's need for or Husband's ability to pay spousal support.

In addition to need and ability to pay, other relevant factors also support an award of spousal support to Wife. In particular, this was a lengthy marriage, Husband is ten years younger than Wife, and Husband has no apparent physical or mental limitations versus Wife's disability. Lastly, a consideration of relative fault in the demise of the marriage also weighs in Wife's favor. In short, we conclude that the trial court did not abuse its discretion in fashioning its award of alimony in futuro to Wife.

## VII.

The judgment of the trial court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of its judgment and for collection of costs assessed below. Costs on appeal are taxed against the appellant, Keith M. Farnham.

_____
CHARLES D. SUSANO, JR., JUDGE