IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 16, 2019 Session

## SALLIE LUNN TARVER v. JOHN TAYLOR TARVER, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000207-14   Robert Samual Weiss, Judge**

———————————————————

**No. W2017-01556-COA-R3-CV**

———————————————————

This appeal involves a unique divorce proceeding. Throughout most of the parties' 29-year marriage, the husband worked as vice president of his father's railroad construction business. Numerous properties, assets, and accounts were jointly titled in the names of the husband and his father over the years. When the wife filed a complaint for divorce, she named as defendants not only the husband but also his father. Shortly thereafter, the husband's father drastically reduced the amount of money the husband was receiving from the company. The divorce trial was conducted over the course of twelve days. The trial court classified some of the disputed assets as belonging solely to the husband's father. It found that the husband had an ownership interest in other property and included it in the marital estate subject to equitable division. The trial court imputed income to both the husband and the wife and ordered the husband to pay alimony and child support. The parties raise various issues on appeal regarding the classification, valuation, and division of marital property, the imputation of income for purposes of alimony and child support, and the alimony award. The wife also seeks an award of attorney's fees on appeal. For the following reasons, we affirm the trial court's decision in all respects and deny the request for attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ROBERT E. LEE DAVIES, Sr. J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN EVERETT WILLIAMS, Sp. J., joined.

Stephen F. Libby, Memphis, Tennessee, for the appellants, John Kirk Tarver and John Taylor Tarver.

Charles H. Barnett, III, and Sara E. Barnett, Jackson, Tennessee, for the appellee, Sallie Lunn Tarver.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

John Kirk Tarver ("Husband") and Sallie Lunn Tarver ("Wife") were married in 1987 when both parties were 23 years old. Husband's father, John Taylor Tarver ("Grandfather"), owned a railroad construction business in Memphis called Shelby Railroad Service, Inc., which Grandfather founded in 1974.[1] Husband had been working at Shelby Railroad since age 18 while taking some college courses. Grandfather fired Husband twice around 1987 and 1988 due to disagreements, but each time, Husband returned to Shelby Railroad within a matter of months. At some point between 1988 and 1993, Grandfather named Husband the Vice President of Shelby Railroad and moved him from manual labor to an office position with the intention that he would one day run the company. Husband was fired once more in 2005 for a period of months, but he otherwise worked as Vice President of Shelby Railroad for the duration of the parties' marriage. During this time, Grandfather added Husband's name (and sometimes the names of his grandchildren) to many accounts and certificates of deposit that Grandfather acquired. Husband was Grandfather's only child, and Grandfather would later testify that he routinely added Husband's names to accounts and assets in a rudimentary estate planning effort.

Wife has a college degree in fashion merchandising but never worked in that field. After the parties married, she initially worked at a service center and then obtained employment in the health insurance industry, where she worked as a data entry and enrollment clerk and customer service representative. Husband and Wife had four children during the marriage, born between 1993 and 2002. Wife gave birth to the parties' twins in 2002 and continued to work from home 30 hours per week in order to care for the children and avoid daycare costs. By this time, Husband had become one of the major producers with respect to generating business for Shelby Railroad and was primarily responsible for its railroad work. In 2003 and 2004, Husband was paid annual compensation from Shelby Railroad ranging between $152,342 and $175,403.

During the summer of 2005, Husband and Grandfather had a disagreement that led to Husband leaving his employment at Shelby Railroad. Husband described the incident as "a combination" of him quitting and Grandfather firing him. Husband worked at other jobs for a few months and rarely spoke to Grandfather. In order to pay for their children's private school tuition, Husband and Wife utilized trust fund money belonging to Wife and cashed in a certificate of deposit funded by Grandfather that was listed in the names of Grandfather, Husband, and Wife. In early 2006, there was some discussion about Husband purchasing Shelby Railroad from Grandfather. However, Grandfather would have had to finance the purchase, and the parties never reached an agreement as to

---

[1] Shelby Railroad builds and repairs railroad tracks for private industries.

terms.

During this period, Grandfather was also embroiled in an eminent domain proceeding in which a railroad was acquiring the real property where he had been operating Shelby Railroad. Grandfather decided that if Husband did not return to work at Shelby Railroad, Grandfather would not continue the business, as this would require obtaining new real property and moving the company. He wrote letters to Husband acknowledging that he could not do all of the work by himself anymore and inviting Husband to come back, discuss the situation, and "put everything on the table." Grandfather wrote a lengthy letter on March 20, 2006, which closed by stating, in part:

> Kirk, I would like to see you come back but the[re] must be a great TRUST between you & I. I was the founder of [Shelby Railroad]. I lost interest in the co. several years ago & you told me you wanted to continue the co. . . . The BNSF RR is going to pay me $3,000,000.00 for everything – for the property & moving. It will take all of this money to buy new property, move[,] & re-establish. . . . After July 1 – The BNSF RR I am sure will SUE me & [Shelby Railroad] for not being off of the property. They have already stated in court that I am holding up the entire project.
> Kirk, I cannot make you do what you should do. I really hope you are there in the morning & will work with me on everything!

Within days of this letter, Husband returned to work at Shelby Railroad. There was no written document executed in connection with his return. Husband and Grandfather deny that Husband was offered any incentive for returning to work aside from his salary. However, according to Wife, she and Husband had a discussion before Husband agreed to return to work, and Husband agreed with her suggestion to demand an ownership interest in either the company or the real property before he would agree to return.

Roughly one month after Husband's return to work, on April 24, 2006, Grandfather utilized the money from the eminent domain proceeding to purchase the first of several unimproved parcels that would be used for the new business location for Shelby Railroad. Other adjoining parcels were subsequently acquired, all on Shelby Drive in Memphis, for a total of twenty acres. Husband's name had never before been listed on the deeds to the real property where Shelby Railroad operated. However, when these parcels were acquired for the new location, Grandfather titled each of the properties in his name along with Husband's name as joint tenants with the right of survivorship.[2]

---

[2] In a joint tenancy with an express right of survivorship and two joint tenants, each joint tenant owns "a proportional (one half) share, with the survivor to take the Property in fee simple upon the death of the other." *Bryant v. Bryant*, 522 S.W.3d 392, 413 (Tenn. 2017). In *Bryant*, the Tennessee Supreme Court "join[ed] the majority of jurisdictions in following the common-law doctrine of severance and [held] that a joint tenancy with an express right of survivorship may be severed and the estate thereby turned into a tenancy in common, by any one of the joint owners, at his will." *Id.* at 411 (internal

Thereafter, construction began on the Shelby Drive property for an office building and a very large shop building (nearly the size of a football field) to be used by Shelby Railroad. The funds used to construct the buildings on the Shelby Drive property came from the proceeds from the eminent domain proceeding, which were placed in an account that was listed in the names of Grandfather and Husband. Husband made no financial contribution toward the property or its upkeep or expenses, as Shelby Railroad paid for all property taxes, maintenance, and repairs in connection with the real property.

Around this time, in 2009, Wife was "laid off" from her job in the health insurance industry, and she never returned to work thereafter. Throughout her twenty years of employment during the marriage, she had never earned more than $22,000 annually. However, Husband received over $200,000 per year in salary and bonuses from Shelby Railroad in 2007, 2008, and 2009 (after his return to work).

In 2010, Shelby Railroad began conducting operations from the newly constructed buildings at the Shelby Drive location. Although there was no written lease agreement in existence, Shelby Railroad began paying "rent" to Husband and Grandfather, the two owners of the real property according to the deeds. This rent was paid instead of Husband's usual "bonuses." Grandfather unilaterally determined the amount of rent to be paid without consulting with Husband. Husband later explained that this "rent" arrangement was simply intended to avoid taxes that would have otherwise been owed if the money he received was classified as payroll. Grandfather confirmed that the rental payments were simply an attempt on his part "to funnel as much money as I could to [Father] and his family" while avoiding taxes and worker's compensation expenses. Grandfather said the amount of rent he paid was simply based on "what I wanted to [pay]."

For instance, in 2010, Shelby Railroad paid annual rent of $130,000 to Husband while also paying rent to Grandfather. In 2011, 2012, and 2013, Shelby Railroad paid $180,000 per year in rent to Husband and $180,000 per year in rent to Grandfather. In addition to these rental payments, Husband also received an annual salary from Shelby Railroad ranging between $76,500 and $79,500 in 2011, 2012, and 2013. Overall, then, Husband received over $250,000 per year from Shelby Railroad in 2011, 2012, and 2013, classified as a combination of rent and salary payments.

In addition to the compensation Husband received directly from Shelby Railroad, the company also either paid directly or reimbursed Husband and Wife for numerous personal expenses, such as the property taxes on their marital residence, uncovered medical expenses, family dining expenses, groceries, clothing, furniture, and personal

---

quotation omitted). "[B]oth joint tenants and tenants in common have essentially the same rights, which are the 'right to use, to exclude, and to enjoy a share of the property's income.'" *Id.* at 404 (quoting *U.S. v. Craft*, 535 U.S. 274, 280 (2002)).

travel expenses. Shelby Railroad also provided Husband and Wife with vehicles for their personal use and paid for their auto insurance, repairs, and gas. In addition, Shelby Railroad paid for the majority of the construction costs for the parties' marital residence in Cordova, so they had no mortgage. The home was valued by the county property tax assessor at $481,600. None of these personal expenses paid by Shelby Railroad were reflected as income on Husband's W-2 forms.

Wife filed a complaint for divorce in January 2014, alleging that Husband had taken off his wedding band and begun sleeping on the couch. The parties' two oldest children had reached the age of majority, but the twins were only eleven years old. Wife asked the trial court to enter a parenting plan and a final decree of divorce equitably dividing the parties' marital property and awarding her child support, alimony, and attorney's fees. The complaint stated that Grandfather was also named as a defendant for the purpose of adjudicating property rights due to various assets being jointly titled in the names of Husband and Grandfather, such as the Shelby Drive property. Husband filed an answer and counter-complaint for divorce.

Husband and Grandfather were represented by the same attorney throughout the divorce proceeding. However, not long after the complaint was filed, Grandfather admittedly "got upset" and "cut off . . . the faucet" of financial support to Husband and his family. This drastically diminished the standard of living previously enjoyed by Husband and Wife and their children. However, Husband took the position that he had no control over Grandfather and was "at his father's mercy." Grandfather reduced Father's annual rent payments from Shelby Railroad from $180,000 per year to only $2,400 per year. From that point forward, Husband only received his base salary of around $80,000 with no bonuses. Shelby Railroad also stopped paying for the family's health insurance policy, so Husband individually began paying a premium of roughly $2,200 per month and then claiming that he could no longer afford to pay for other family expenses because his health insurance cost equated to half of his take-home pay. Grandfather then took a $300,000 "bonus" from Shelby Railroad and "loaned" money to Husband to pay for his expenses, such as medical costs, his children's tuition, and attorney's fees. As a result, Husband claimed that he owed Grandfather $252,014 in "loans" for money that he borrowed during the divorce proceeding. Shelby Railroad also stopped paying for gas and repairs for Wife's vehicle and the older children's vehicles, and Grandfather stopped paying for the oldest child's college tuition at a private university. Wife had been driving a Cadillac Escalade that was furnished by Shelby Railroad, but when she went to have the vehicle serviced at a dealership, she learned that Grandfather had told the dealership not to release the vehicle to anyone except him, so she was not permitted to leave with the vehicle. Grandfather had the Escalade taken to Shelby Railroad, and Wife drove a ten-year old minivan for the remainder of the divorce proceeding (which the trial court ultimately valued at $1,584). At the same time, however, Shelby Railroad purchased a brand new loaded Ford F-150 for Husband to drive.

Husband and Wife ultimately came to an agreement regarding the issue of parenting time, agreeing to a 50/50 arrangement, but they could not agree as to the issues of property classification and division, child support, alimony, or attorney's fees. The trial court bifurcated the proceedings to first determine whether Husband had any ownership interest in the Shelby Railroad corporation. After hearing three days of testimony, the trial court entered an order finding that although some records indicated that Husband owned a ten percent ownership interest in the company, other records stated that he did not, and the weight of the evidence suggested that he did not in fact own any interest in the business. However, the trial court found that Husband *was* a joint owner of the real property and buildings located at Shelby Drive, owning "a half interest in that property." Notably, the trial court's order also states that the court did not find any of the parties' testimony to be particularly credible, considering their oral testimony, body language, and demeanor. In fact, at the conclusion of the hearing, the trial judge stated:

> [T]he reason I've had so much trouble with this case is that lies are hard, and especially when none of the parties on both sides of the case are completely telling the truth. The body language and tone of the parties bears mention. Not one of you seemed confident about anything that came out of any of your mouths. Your facial expressions, even today, are just -- tell the story.

The trial court also found that the claims made by Husband and Grandfather regarding their inability to find relevant documents regarding Shelby Railroad were not credible and were "absolutely ridiculous." The court found that Husband and Grandfather had engaged in "extreme discovery abuses."

Over the course of eight more days in September 2016, the trial court heard additional testimony from Wife, Husband, Grandfather, the bookkeeper for Shelby Railroad, two appraisers, two accountants, a vocational consultant, and various other witnesses. Husband was 51 years old by this time, and Wife was 52 years old. Wife had not worked full-time in nearly twenty years and had not been employed at all for seven years. She was receiving only $778 in monthly income from a trust fund and sought an award of long-term alimony in the sum of $5,000 per month. Wife believed that Husband would return to the parties' marital standard of living once the divorce proceeding was over. Wife testified that she had borrowed roughly $550,000 from her brother during the divorce proceeding to pay for attorney's fees and other expenses.

Wife presented the testimony of a forensic certified public accountant and economist regarding an appropriate calculation of Husband's income for purposes of alimony and child support. He considered Husband's history of receiving benefits from Shelby Railroad consisting of salary/bonuses, rent, and reimbursements for personal expenses. He explained that the company's payment of personal expenses for Husband

should have been reflected on Husband's W-2 as taxable income. Accordingly, he calculated Husband's total income by adding his base salary, expected rent payments, and the value of the personal expenses paid by Shelby Railroad. Depending on whether Husband continued to receive rent at the historic rental rate of $180,000 or a reduced rate based on fair market rental value, he calculated Husband's total annual income as either $285,993 or $216,958. In the same fashion, Husband presented the testimony of a vocational consultant regarding Wife's projected income. He testified that Wife could enter the labor market and expect to start out earning $28,000 if working full-time.

Wife's appraiser testified regarding the value of the Shelby Drive property, which consisted of twenty acres, an office building of 4,741 square feet, and a garage service building containing 18,620 square feet. He opined that the real property and improvements were worth $2,870,000. However, Husband's appraiser estimated the value at only $1,810,000. The parties also presented testimony regarding the fair market *rental* value of the Shelby Drive property. Wife's appraiser estimated the fair rental value to be $221,930 per year. Husband's appraiser calculated the fair rental value at $178,448 per year.

During his testimony, Grandfather acknowledged that Husband had an ownership interest in the Shelby Drive property, adding, "I gave him 50 percent of the property." However, both Husband and Grandfather flatly denied that Husband's return to work at Shelby Railroad had anything to do with his name being placed on the deed to the Shelby Drive property weeks later. According to Grandfather, the family attorney simply recommended "out of the blue" that Husband's name should be added to the deeds, and Grandfather "had no problem doing that." Husband likewise acknowledged that he had "a legal interest" in the property, but Husband suggested that his ownership interest was received either as a gift or a "future inheritance."

The trial court announced its oral ruling on November 8, 2016, and entered a divorce decree on December 16, 2016. After numerous post-trial motions, the court entered an amended final decree on July 18, 2017. For clarity, we will discuss the trial court's final calculations and rulings on each of the issues. At the outset, we note that the trial court incorporated by reference its previous order from the first three days of trial, in which it found that none of the parties were particularly credible. In its final order, the trial court further found that "Husband and Grandfather abused the discovery process throughout the case," and the court added that their lack of organization relating to Shelby Railroad and failure to be forthcoming with documents were "truly baffling to the Court."

The trial court declared the parties divorced, finding that both parties contributed to the collapse of the marriage. The trial court classified and equitably divided numerous assets and debts, but the only asset specifically raised as an issue on appeal is the Shelby Drive property. The trial court found that Husband owned a one-half interest in the

Shelby Drive property, which was jointly titled in the names of Grandfather and Husband. Because this property interest was acquired during the marriage, the trial court started with the presumption that Husband's ownership interest in the property was marital property subject to equitable division. Considering all the testimony, the trial court concluded that Husband failed to carry his burden of showing that his interest in the Shelby Drive property was a mere gift that would render it separate property. To the contrary, the trial court found that Husband acquired his ownership interest in the real property as an incentive to return to work for Shelby Railroad in 2006. The trial court acknowledged that it had no evidence of any employment contract or documentation of the terms of reemployment, and it specifically found that neither Husband nor Grandfather provided a good "explanation" for how it was agreed that Husband would return to work at Shelby Railroad. However, based on the circumstances, history, and timing of the acquisition and development of the property in relation to Husband's return to work, the court concluded that Husband acquired his ownership interest in the property in consideration for his agreement to return to work in that same timeframe.

Next, the trial court determined the appropriate value to be placed on Husband's ownership interest in the Shelby Drive property. The trial court discussed the testimony of the parties' two appraisers and rejected some deductions that were included in the calculation used by Husband's appraiser. After adding these erroneous deductions back to the calculation reached by Husband's appraiser, the trial court averaged the valuation opinion of Wife's appraiser ($2,870,000) and the valuation opinion of Husband's appraiser as adjusted ($1,839,722). Using this average, the trial court placed an overall value on the Shelby Drive property of $2,479,861. The trial court valued Husband's ownership interest at one-half that amount, $1,239,930.50. Husband was permitted to retain all of his ownership interest in the Shelby Drive property, but Wife was awarded a judgment against Husband as alimony in solido in the amount of $619,965.25, representing one-half of the value of Husband's interest in the real property. Husband was ordered to pay the alimony in solido to Wife in monthly installments of $2,719 until paid in full. The trial court originally ruled that this obligation would last eighteen years and bear statutory post-judgment interest at the rate of 5.25%, but after considering the parties' post-trial motions to alter or amend, the trial court eliminated the interest obligation.

The trial court found it appropriate to impute income to both Husband and Wife for purposes of alimony and child support. Regarding the rental payments to Husband that Grandfather drastically reduced during the divorce proceeding, the trial court acknowledged Grandfather's testimony that he ran Shelby Railroad like a dictatorship and could pay any amount he pleased. However, for purposes of computing Husband's income for alimony and child support, the trial court found it appropriate to look to the amounts Husband had been paid historically in addition to the rental value of the property. The trial court found the fair rental value calculation used by Husband's appraiser to be more persuasive and utilized his figure of $178,448 for the fair rental

value of the property. Husband's one-half share of such an annual rental payment would be $89,224, or $7,435 per month. In addition to this rental income, the trial court considered Husband's annual salary of around $78,500 and the value of the personal expenses Shelby Railroad routinely paid for Husband, as described by Wife's expert witness. After making two adjustments to the expert's opinion, the trial court set Husband's monthly income for purposes of alimony and child support at $15,707.35 (which equates to $188,488.20 per year). The trial court found that Wife had made only a negligible effort to become employed and was willfully unemployed at the time of trial, so it imputed income to her in the sum of $28,000 per year. Using this figure and Wife's monthly trust income of $778 per month, her monthly income was set at $3,111.

Ultimately, Husband was ordered to pay $1,332 in monthly child support plus the cost of the children's private school tuition. The trial court awarded Wife alimony in futuro in the sum of $1,500 per month until the twins (then age 15) graduate from high school in May 2021, at which time the alimony would increase by the amount originally owed for child support to a total of $2,832 per month for an additional ten years, until December 2031. The trial court ordered Husband to be responsible for his own attorney's fees, which totaled $331,000, and the court ordered Husband to pay $200,000 of Wife's attorney's fees, which totaled over $649,000. Husband and Grandfather timely filed a notice of appeal.

## II. ISSUES PRESENTED

Husband and Grandfather present the following issues, which we have slightly restated, for review on appeal:

1.      Whether the trial court erred by classifying the real property and buildings located at Shelby Drive as marital property when Husband's interest in said property was given to him by his father, he paid no consideration and made no monetary contribution to the improvements, and there was no proof that Grandfather's gift of said property related to Husband's agreement to return to work;

2.      Whether the trial court erred in valuing Husband's interest in the Shelby Drive property at one-half of the total value and equal to Grandfather's interest without considering the amount of Grandfather's contributions; and

3.      Whether the trial court erred in determining Husband's income for purposes of alimony and child support and in setting the amount of alimony.

In her posture as appellee, Wife raises the following additional issues for review:

4.      Whether the trial court failed to award Wife one-half of the present value of the Shelby Drive property; and

5.     Whether this Court should award Wife her attorney's fees on appeal.

For the following reasons, we affirm the decision of the trial court and respectfully deny Wife's request for an award of attorney's fees on appeal.

### III.   DISCUSSION

#### A.     *The Shelby Drive Property*

#### 1.     Marital Property or Separate Property

We begin with Husband and Grandfather's contention that Husband's ownership interest in the Shelby Drive property was a gift from Grandfather and should therefore be classified as Husband's separate property rather than marital property.

In Tennessee, our domestic relations law recognizes "marital property" and "separate property." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). Marital property must be divided equitably between the divorcing parties. *Id.* Separate property, on the other hand, "is not part of the marital estate and is therefore not subject to division." *Id.* Accordingly, before equitably dividing a marital estate, the trial court must first classify all of the assets possessed by the parties as either separate or marital property. *Id.*

By statute, "marital property" is defined as "all real and personal property . . . acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce[.]" Tenn. Code Ann. § 36-4-121(b)(1)(A). The same statute defines "separate property" to include "[p]roperty acquired by a spouse at any time by gift[.]" Tenn. Code Ann. § 36-4-121(b)(2)(D).

The classification of property as separate or marital "does not depend on the state of its record title[.]" *Harper v. Harper*, No. W2017-02193-COA-R3-CV, 2018 WL 5307090, at *2 (Tenn. Ct. App. Oct. 24, 2018). Instead, "[t]he classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). We review findings of fact *de novo* with a presumption of correctness and must honor the trial court's finding unless the evidence preponderates to the contrary. *Id.* Appellate courts give "great weight on appeal" to a trial court's classification of marital property. *Trezevant v. Trezevant*, No. W2017-00715-COA-R3-CV, 2018 WL 1956486, at *5 (Tenn. Ct. App. Apr. 25, 2018) *perm. app. denied.* (Tenn. Sept. 18, 2018). The trial court's classification of an asset is entitled to "considerable deference." *Ogles v. Ogles*, No. M2013-02215-COA-R3-CV, 2015 WL 113336, at *6 (Tenn. Ct. App. Jan. 7, 2015).

We must also begin with the presumption that property acquired by a spouse during the marriage is marital property. *See Disterdick v. Disterdick*, No. E2017-00743-COA-R3-CV, 2018 WL 3026063, at *7 (Tenn. Ct. App. June 18, 2018) ("It is well settled that assets acquired during a marriage are presumed to be marital property and that a party desirous of disputing this classification has the burden of proving by a preponderance of the evidence that the asset is separate property."); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007); *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). However, this presumption may be rebutted by showing that the property was acquired by gift. *Trezevant*, 2018 WL 1956486, at *11; *Dunlap*, 996 S.W.2d at 814. In Tennessee, the party asserting the gift has the burden of proving two formal elements of a gift: (1) an intention by the donor to make a present gift; and (2) delivery of the gift by which the donor surrendered complete dominion and control of the property. *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006); *Dunlap*, 996 S.W.2d at 814-15. These two elements "must clearly appear," and "[d]oubts must be resolved against the gift." *Gentry v. Gentry*, No. M2016-01765-COA-R3-CV, 2017 WL 6623387, at *7 (Tenn. Ct. App. Dec. 28, 2017) *perm. app. denied* (Tenn. May 16, 2018) (internal quotations omitted). The donor's intent must be determined "from the totality of the circumstances." *Trezevant*, 2018 WL 1956486, at *12.

The facts of this case are analogous to those in *Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544 (Tenn. Ct. App. Feb. 13, 2017). In that divorce case, the husband had acquired a two-thirds interest in a limited liability company that owned a building where the husband's father operated a dental practice in Indiana. *Id.* at *1. The trial court classified the interest as marital property, but the husband claimed that he had received his interest as a gift and therefore it was separate property. *Id.* at *7. Because the husband's interest was acquired during the marriage, this Court explained that he had the burden of proving that his interest was separate property. *Id.* We ultimately concluded that the evidence did not preponderate against the trial court's classification of the interest as marital. *Id.* at *8. Although the husband insisted that his interest was nothing more than a gift, the evidence supported the trial court's conclusion that the husband's interest in the LLC was "earned" during the marriage. *Id.* His testimony showed that "he would not have acquired an interest in the Indiana LLC had he not been willing to work for his father's dental practice." *Id.* The husband acknowledged during his deposition that his father "induced" him to come to Indiana by offering him the building. *Id.* Additionally, even though the husband testified that he did not pay anything for the interest, the company's operating agreement stated otherwise. *Id.*

We recognize that the testimony in this case is not quite as direct as that in *Bewick*, as Husband has denied any connection between his acquisition of the ownership interest and his work for Shelby Railroad. Admittedly, the parties' transactions were very informal, as Grandfather acknowledged that he often operates on "gentlemen's

agreements." We have no written employment agreement reflecting the terms of Husband's re-employment. During the relevant timeframe, however, there were discussions and letters exchanged regarding Husband purchasing Shelby Railroad *and* the property where it would operate after the move. The sale was never completed. However, Wife testified that she and Husband discussed the situation just a couple of days before Husband returned to work, and at that time, Husband intended to demand an ownership interest either in the company or in the property before he would agree to return to work for Shelby Railroad, as they believed that an ownership interest would diminish the chances of Grandfather firing Husband again and impacting their ability to pay for private school. Grandfather invited Husband to return to Shelby Railroad and "work with me on everything." Husband did return within days. When the first parcel was acquired approximately one month later, Husband's name was added to the deed, and it was added to each subsequent deed. Still, Husband and Grandfather insist that there was no agreement or incentive offered in connection with Husband's return to work. In fact, Husband and Grandfather insist that they had *no negotiations whatsoever* about Husband's return to work. Grandfather claimed that he simply added Husband's name to the deed at the suggestion of his attorney as an estate planning mechanism. And, when Grandfather was asked at trial whether he considered it a gift when he added Husband's name to the deed, he responded, "I didn't think of it as a gift. I didn't think of it as anything."

The trial court implicitly rejected the testimony of Grandfather and Husband with respect to this issue by concluding that Husband did in fact acquire his ownership interest in the Shelby Drive property in consideration for his agreement to return to work at Shelby Railroad in the same timeframe. The trial court explicitly found that "[n]either Husband nor Grandfather had a good description or explanation on how it was agreed that Father would return to working for Shelby Railroad Service." Considering "the circumstances, history and timing of the acquisition and development of the property and Husband's return to work," the court concluded that Husband received his ownership interest as an "incentive to return to work" for Shelby Railroad. According to the court, the surrounding facts and circumstances were "consistent with an agreement for Husband to receive his ownership interest in the property from Grandfather in exchange for his renewed employment at Shelby Railroad[.]" The court noted the presumption that assets acquired during the marriage are presumed to be marital property and that it was Husband's burden to show that the asset was his separate property. The court ultimately concluded that Husband failed to present sufficient evidence to overcome the presumption that his interest was marital property.

On appeal, Husband bears the burden of showing that the preponderance of the evidence weighs against the trial court's finding. *See Stagner v. Stagner*, No. W2009-01749-COA-R3-CV, 2010 WL 3717030, at *11 (Tenn. Ct. App. Sept. 23, 2010). According due deference to the trial court's credibility determinations, we cannot say that the evidence preponderates against the trial court's factual finding regarding the nature of

Husband's interest in the Shelby Drive property and specifically its finding that Husband received his interest not as a mere gift but as an inducement or incentive to return to work.[3] *See Bewick*, 2017 WL 568544, at *8; *see also Stagner*, 2010 WL 3717030, at *12 (concluding that a husband failed to sufficiently rebut the presumption that a $168,177 check he received from his parents during the marriage was marital property where the parties' transactions were very informal and the trial court apparently credited the wife's testimony that the check was intended as a payment for equity in property and not simply a benevolent gift); *Wells v. Wells*, No. W2009-01600-COA-R3-CV, 2010 WL 891885, at *6 (Tenn. Ct. App. Mar. 15, 2010) (finding that a husband failed to rebut the presumption that real property deeded to him by his father during the marriage was marital property where the parties presented almost no evidence aside from their competing testimonies and the trial court concluded that the property was not a gift but was intended as repayment of a loan). We therefore affirm the trial court's factual finding that Husband's interest in the Shelby Drive property was marital property subject to equitable division.

## 2. Valuation of Husband's Interest in the Shelby Drive Property

After determining that Husband's interest in the Shelby Drive property was marital property subject to division, the trial court proceeded to value Husband's ownership interest. First, the trial court placed an overall value on the Shelby Drive property of $2,479,861 (which the parties do not challenge on appeal). Then, the court determined the value of Husband's interest in the property.[4] Husband and Grandfather

---

[3] On appeal, Husband and Grandfather briefly suggest that any such incentive agreement would be unenforceable due to indefinite terms, no meeting of the minds, or the statute of frauds. However, they do not cite to any portion of the voluminous record to indicate that these arguments were raised in the trial court. Accordingly, we do not reach these issues. *See Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 146 (Tenn. 2017) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal[.]") We note, however, that Wife is not attempting to enforce the oral agreement in the sense that Grandfather would be required to place Husband's name on the deed. Husband's name is already on the deed. The trial court was simply tasked with determining whether Husband acquired that ownership interest by gift as opposed to an incentive agreement.

[4] Although it arguably was not designated as an issue for review on appeal, at some points in their brief on appeal, Husband and Grandfather suggest that the trial court erred in concluding that Husband owned any interest in the *buildings* constructed on the Shelby Drive property because Grandfather testified that he only intended to make a gift to Husband of an interest in the underlying real property, not the buildings that would be constructed on it later. However, the trial court did not credit Grandfather's testimony about his intention to make a gift, so his testimony about the extent of his gift is not determinative.

"[B]uildings erected on land generally become part of the real property." *In re Estate of Ross*, No. M2012-02228-COA-R3-CV, 2013 WL 3346717, at *7 (Tenn. Ct. App. June 27, 2013) (citing *Dudzick v. Lewis*, 175 Tenn. 246 (1939)). Here, Husband was a co-owner of the real property according to the deed, he received one-half of the rent from the property and its buildings, and he claimed one-half of the depreciation for the buildings on his tax returns. Even the accountant who testified at trial for Husband and Grandfather conceded that Husband "has an ownership interest in the building." The expert witnesses at trial consistently agreed that only someone who is an owner of a building can legally claim a

were listed as joint owners on the deed to the property. In a joint tenancy, "each of the owners has an undivided moiety, or other proportional part, of the whole premises." *Bryant*, 522 S.W.3d at 401 (quotation omitted). In other words, as joint tenants, Husband and Grandfather each owned "a proportional (one half) share" of the property. *See id.* at 413; *see also Black's Law Dictionary* (10th ed. 2014) (explaining that in a "joint tenancy" the joint tenants "have identical interests in a property with the same right of possession"). Again, both Husband and Grandfather were receiving one-half of the rent from the property and its buildings, and Husband and Wife claimed one-half of the depreciation on the buildings on their joint tax returns, while Grandfather claimed the other half. For purposes of dividing the marital property, then, the trial court valued Husband's ownership interest in the Shelby Drive property at one-half of its total value, equaling $1,239,930.50.

On appeal, Husband and Grandfather argue that the trial court erred in valuing Husband's interest in the Shelby Drive property at one-half of its total value and equal to Grandfather's interest. Husband and Grandfather argue that Grandfather invested millions of dollars to purchase and improve the property and that Husband made no monetary contribution whatsoever. They argue that the trial court should have considered "which owner expended funds to procure and/or improve" the Shelby Drive property when valuing Husband's ownership interest.

In support of their valuation argument, Husband and Grandfather rely on testimony they presented at trial from a certified public accountant, who opined that the arrangement between Husband and Grandfather appeared to be "basically . . . a joint venture." He added, "And all a joint venture is, is just simply a venture between two people." The accountant testified that "it would seem reasonable" if one party pays a disproportionate amount for expenses for the venture for him to receive money back to make it proportionate. The accountant conceded that he was not aware of any agreement between Husband and Grandfather to this effect and that he was simply looking at the facts "from an accounting standpoint." He simply suggested that if Husband and Grandfather were equal partners, then Husband should owe Grandfather a debt for one-half of all the sums Grandfather expended from the eminent domain proceeds to purchase the real property and construct the improvements on Shelby Drive. The accountant suggested that Husband could repay Grandfather by either securing a loan for $1.3 million or assigning Grandfather his rental payments from Shelby Railroad.[5] On cross-

depreciation deduction for it, as Husband did for several years. Thus, we cannot say that the trial court erred in concluding that Husband's ownership interest in the property also extended to the buildings, even though Grandfather testified to the contrary.

[5] Husband and Grandfather did raise an argument in the trial court regarding the construction expenses and asserted that Husband had an obligation to repay Grandfather for those costs, but their argument was raised in a different context. In the trial court, Husband and Grandfather asserted that the trial court should not assign any income to Husband based on rent from Shelby Railroad because Grandfather would be entitled to repayment for one-half of his expenditures before Husband would be

examination, the accountant conceded that he found no document evidencing that Husband owed Grandfather anything in connection with the building or improvements. No such debt was listed on the tax returns, company books, or otherwise recorded at all, even though employee loans were documented. The accountant also conceded that in a joint venture, one member may contribute labor or other commitments rather than monetary contributions.

Although Grandfather and Husband mention this "joint venture" theory on appeal, they do not cite any legal authority regarding joint ventures.

> The Tennessee Supreme Court, quoting Dean William L. Prosser, has characterized a joint venture as "something like a partnership, for a more limited period of time and a more limited purpose." *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995). As the Court views it, a joint venture is "an association of persons with intent ... to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, ... and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure." *Spencer Kellogg & Sons, Inc. v. Lobban*, 204 Tenn. 79, 92-93, 315 S.W.2d 514, 520 (1958). Even though joint ventures are not technically partnerships, they are governed by the same rules of law that govern partnerships. *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 212 (Tenn. 1992); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605-06 (Tenn. Ct. App. 2001).

*Hardy v. Miller*, No. M1998-00940-COA-R3-CV, 2001 WL 1565549, at *4 n.2 (Tenn. Ct. App. Dec. 10, 2001). Because Grandfather and Husband do not cite any legal authority regarding joint ventures or partnership law, we decline to consider whether Husband would be liable to Grandfather under the rules of law that govern joint ventures or partnerships. *See Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

---

entitled to receive any rent from the property (even though he had been receiving rent for several years). In their motion to alter or amend, Husband and Grandfather altered their theory and asserted that Husband's "obligation" to repay Grandfather should be offset against the valuation of Husband's interest in the real property.

As *legal* authority for their argument on appeal, Husband and Grandfather cite exclusively to real property partition cases but argue that "the principles remain the same" in a divorce case. Husband and Grandfather rely most heavily on *Parker v. Lambert*, 206 S.W.3d 1 (Tenn. Ct. App. 2006). In that partition case, the Court explained:

> *Where jointly held property is sold, the sale proceeds* are to be divided between the parties in accordance with their rights as determined by the court. Tenn. Code Ann. § 29-27-217 (2005); *see also* Tenn. Code Ann. § 29-27-113 (2005). "[T]he Court has a statutory and inherent right to adjust the equities and settle all claims between or among the parties . . . ." *Yates v. Yates*, 571 S.W.2d 293, 296 (Tenn. 1978).

*Id.* at 4 (emphasis added). The two statutes cited by the Court are found in the Chapter of the Tennessee Code governing partition actions. The *Parker* Court went on to explain that when courts are dividing compensation or sale proceeds "*in the partition context*," they "will compensate a cotenant who improved the jointly owned property as long as the improvements enhanced the property's value." *Id.* at 5 n.2 (emphasis added). In the *Parker* case, for instance, one co-tenant was "entitled to claim an equitable allowance" from the partition sale proceeds for his expenditures on improvements. *Id.* at 5. However, the *Parker* Court also noted that partition sale proceeds have been *equally* divided in a case when the parties "did not assert a claim for contribution" for disproportionate expenses. *Id.* at 4 (citing *Rivkin v. Postal*, No. M1999-01947-COA-R3-CV, 2001 WL 1077952, at *10-11 (Tenn. Ct. App. Sept. 14, 2001)). Thus, in a partition case, "[t]here is generally a presumption that joint tenants have equal interests, but a tenant who pays more than his or her share for the property *may* seek contribution to compensate him or her." *Brewer v. Brewer*, No. M2010-00768-COA-R3-CV, 2011 WL 532267, at *2 (Tenn. Ct. App. Feb. 14, 2011) (emphasis added).

Based on the partition sale cases, Husband and Grandfather maintain on appeal that "Grandfather invested approximately $2,304,563.23 while Husband invested $0.00," and therefore, Grandfather is owed "one half of that amount or roughly $1,150,000.00 [] in order to fix the disproportionate share of the expenditures[.]" However, we are not persuaded that the principles applicable to partition sale proceeds should be applied in this divorce case in order to value Husband's interest in the real property for purposes of marital property division.

Initially, we note that Grandfather's own testimony refutes the suggestion that the construction costs were incurred as a common obligation or liability or that he or Husband ever intended for Husband to repay any costs in connection with the construction of the buildings. Regarding the payments for the construction, Grandfather testified, "I built the buildings with my money. Nobody else had any money to do it, but I wanted to retain everything." He added, "I paid for everything. It was mine. I didn't

- 16 -

have anybody else that wanted to pay anything. I didn't want any partners ever again. I didn't want any investors or anything." Grandfather acknowledges that he made the last payment to the construction contractor in 2009, yet there is no evidence that either Grandfather or Husband had recognized any type of debt owed by Husband in connection with the property by the time this divorce proceeding was filed five years later. Not a single record evidenced such a debt being owed, and Husband had never made any payments toward such a debt. Instead, Husband was receiving one-half of the rent from the property each year without any deduction for a debt he owed in connection with the property. Grandfather prepared a document early in the divorce proceeding entitled "Money Kirk Owes John Taylor Tarver," and no debt was listed for any share of the construction costs.

It is also worth noting that Husband and Grandfather do not argue that this alleged debt in connection with the property would qualify as "marital debt" as that term is used in divorce proceedings. In divorce cases, "'marital debts' are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In their reply brief on appeal, Husband and Grandfather state that they are "*not arguing that there is a formal debt owed* by Husband to Grandfather" but rather seeking to "offset the contributions by Grandfather" against the valuation of Husband's ownership interest. (emphasis added).

Still, we find that the principles applicable to partition cases do not entitle Husband and Grandfather to the relief they seek on appeal. In the partition context, the general rule with regard to compensation for improvements is:

> where a cotenant places improvements on the common property, equity will take this fact into consideration *on partition* and will *in some way* compensate him for such improvements, provided they are made in good faith and are of a necessary and substantial nature, materially enhancing the value of the common property.

*Butler v. Butler*, No. 86-60-II, 1986 WL 8593, at *2 (Tenn. Ct. App. Aug. 6, 1986) (quoting 68 C.J.S. *Partition* § 139 (1950)) (emphasis added). But, this is not a partition case involving a division of partition sale proceeds, and there has been no suggestion that such a sale was ever contemplated by the parties. To the contrary, the testimony from Grandfather and Husband was consistent in that both men expect Husband to inherit the business and its real property and to continue to run the company when Grandfather dies.

Generally, one co-tenant "can not compel the [other] co-tenants to make improvements, or to contribute *pro rata* to those he may make himself; but in the event of partition, the improvements one has made at his own expense may be taken into account." *Broyles v. Waddel*, 58 Tenn. 32, 42 (1872). A co-tenant's right to reimbursement out of the proceeds of a sale of common property is "a mere equity" that

arises and becomes enforceable upon the filing of a bill for partition. *Omohundro v. Elkins*, 71 S.W. 590, 591 (Tenn. 1902).[6] According to 48A C.J.S. *Joint Tenancy* § 25, "one joint tenant generally has no obligation to compensate the other for [] improvements to the property," although this general rule and others are inapplicable where the question of compensation for improvements arises in a suit for partition, an accounting in equity, or a condemnation suit. This is not one of those cases; it is a divorce case in which we are valuing Husband's present marital property interest in jointly owned real property. We reject the suggestion that the principles applicable to partition actions should automatically apply in this divorce case. This Court has described a divorce proceeding as "clearly distinguishable" from a partition suit. *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *6 (Tenn. Ct. App. Sept. 3, 2003) *abrogated on other grounds by Eberbach v. Eberbach*, 535 S.W.3d 467 (Tenn. 2017).

When valuing Husband's ownership interest in the Shelby Drive property, the trial court determined that it was appropriate to value Husband's interest at one-half of the total valuation of the property with no deduction for any debt allegedly owed to Grandfather in connection with the construction costs or any adjustment for what Grandfather might claim if either filed a partition suit. "'The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal.'" *Stratienko v. Stratienko*, 529 S.W.3d 389, 410 (Tenn. Ct. App. 2017) (quoting *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)). Considering all of the evidence, we discern no error in the trial court's valuation of Husband's marital property interest at fifty percent of the total value of the real property and its improvements.[7]

### 3. Elimination of Interest

The final issue we address with regard to the Shelby Drive property was raised on appeal by Wife. After the trial court valued Husband's ownership interest in the property at $1,239,930.50, it determined that Husband would be permitted to retain all of his ownership interest in the property, but Wife would be awarded a judgment against Husband as alimony in solido in the amount of $619,965.25, representing one-half of the value of Husband's interest in the real property. Husband was ordered to pay this award of alimony in solido to Wife in monthly installments of $2,719 until paid in full. The trial court originally ruled that this obligation, which was expected to last 18 years, would also be subject to post-judgment interest at the rate of 5.25%, but after considering the parties' post-trial motions to alter or amend, the trial court eliminated the post-judgment

---

[6] *See also* 1 A.L.R. 1189 (Originally published in 1919) (stating that in partition cases "the allowance or compensation for improvements is, in all cases, made not as a matter of legal right, but purely from the desire of the court to do justice").

[7] Aside from the classification and valuation of Husband's interest in the Shelby Drive property, Husband did not challenge the trial court's division of the marital property and therefore we will not address it here.

interest obligation. It did provide, however, that upon the sale of the properties, "all unpaid installments on the judgment shall be accelerated and Husband shall pay Wife the full outstanding balance owed for the judgment within thirty (30) days from the closing of the sale."

On appeal, Wife acknowledges that she is not statutorily entitled to post-judgment interest on alimony in solido paid in installments pursuant to Tennessee's post-judgment interest statute and the Tennessee Supreme Court's decision in *Price v. Price*, 472 S.W.2d 732, 734 (Tenn. 1971). In *Price*, our supreme court explained that a recipient of alimony in solido payable in monthly installments was not entitled to post-judgment interest where "[the wife] only became entitled to the use of any part of the money represented by this judgment on the date the first installment was due." *Id.*; *see also Norman v. Norman*, No. M2015-02364-COA-R3-CV, 2017 WL 3705121, at *8 (Tenn. Ct. App. Aug. 28, 2017) ("[T]he recipient of an award of alimony in solido payable in installments is not entitled to interest on the judgment from the date of entry."). However, Wife argues that the method of payment devised by the trial court, without any interest obligation, fails to compensate her for one-half of the present value of the Shelby Drive property.

Wife admits that it is fair and reasonable to allow Husband to pay the judgment "over time," but she suggests that Husband is receiving $1,239,930.50 in marital real estate "immediately" while she will not receive her final installment payment for nearly twenty years. According to Wife, there are several ways in which the trial court could have divided the marital assets more equitably in the absence of an interest obligation. She suggests that the trial court could have increased Husband's payments and ordered them to be paid over a shorter period of time,[8] or the court could have awarded her an outright ownership interest in the Shelby Drive property or given her all of the proceeds from the sale of the marital home. Wife also suggests that Husband could borrow $619,965 from a financial institution secured by his $1.2 million interest in the real

---

[8] Wife relies on this Court's decision in *Parker v. Parker*, No. C.A. 164, 1990 WL 48989, at *2 (Tenn. Ct. App. Apr. 24, 1990), wherein this Court stated:

> We find the trial judge's division of the marital assets results in the husband receiving 50% of the marital estate, the capital asset portion of which has been significantly discounted to arrive at a cash value. On the other hand, the wife is receiving her share of the marital capital assets in future periodic payments over ten years. As a result, she is not receiving a 50% share of the marital assets because the present value of a capital sum paid over ten years in future periodic payments without interest is obviously less than a capital sum paid today. No formula requires the wife receive a 50% share of the marital assets in order for a division to be equitable. *See Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988). However, to achieve a more equitable result we adjust the pay-out formula of the marital property in the following manner: The wife is to receive five annual installments of $45,000 each . . . instead of the ten installments of $22,500 ordered by the trial judge. . . .

property in order to pay her immediately. In sum, Wife asks this Court to either rebalance the marital property division, adjust the value of the award in connection with the Shelby Drive property, or remand for the trial court to reconsider the division of assets. Husband, in response, argues that he does not have the present ability to pay $2,719 per month or any increased amount considering the fact that most of his income was imputed. Husband claims that he has no present use of funds from the real property and no ability to "monetize his interest" in the real property either.

A "typical purpose" of an award of alimony in solido is "to adjust the distribution of the parties' marital property." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 108 (Tenn. 2011) (quotation omitted). "[T]rial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Id.* at 105. Appellate courts also "give great weight to the trial court's division of marital property and 'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Larsen-Ball*, 301 S.W.3d at 234 (quoting *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)). "The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt*, 244 S.W.3d at 328. "It is not this court's role to tweak the manner in which a trial court has divided the marital property." *Farnham v. Farnham*, 323 S.W.3d 129, 141 (Tenn. Ct. App. 2009) (citing *Morton v. Morton*, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005)).

We decline Wife's invitation to alter the trial court's marital property division in an attempt to reach a more equitable result. Wife has mostly confined her argument regarding the inequity of the trial court's decision to its manner of dividing this single asset, arguing that she did not receive one-half of the present value of *this* particular property. When a divorcing party appeals a trial court's decision concerning the division of marital property but "'wishes to focus on whether the division as to particular assets was equitable rather than whether the overall property distribution was equitable,'" this Court must avoid such a narrow focus and keep in mind that "'the goal is an overall equitable marital property distribution.'" *Brown v. Brown*, No. E2017-01629-COA-R3-CV, 2018 WL 5307092, at *8 (Tenn. Ct. App. Oct. 25, 2018). "A trial court is charged not with making an equitable division of each separate marital asset but rather with making an equitable division of the entire marital estate." *Givens v. Givens*, No. E2016-00865-COA-R3-CV, 2017 WL 4339489, at *8 (Tenn. Ct. App. Sept. 29, 2017). We cannot view the trial court's ruling regarding the Shelby Drive property in isolation.

Unfortunately, however, neither party has presented this Court with a table that complies with Rule 7 of the Rules of the Court of Appeals that would facilitate our review of the trial court's overall property division. The Rules of this Court "'set out specific requirements for the contents of a brief in a domestic relations case in which a party challenges a trial court's disposition of marital property.'" *Ingram v. Ingram*, No.

W2017-00640-COA-R3-CV, 2018 WL 2749633, at *11 (Tenn. Ct. App. June 7, 2018) (quoting *Townsend v. Townsend*, No. W2004-02034-COA-R3-CV, 2005 WL 3416310, at *6 (Tenn. Ct. App. Dec. 14, 2005)).  Court of Appeals Rule 7 provides:

> (a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

Although Husband's brief has a table attached, it is not substantially similar to the example listed in Rule 7 because it only lists individual assets and debts (with most but not all individually valued), and it contains no totals to reflect the trial court's overall distribution.  A Rule 7 table is supposed to list the following totals with regard to each type of property:

| | | |
|---|---|---|
| Total Separate Property awarded to Husband as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |
| Total Marital Property awarded to Husband as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |
| Total Debt allocated to Husband as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |
| Total Separate Property awarded to Wife as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |
| Total Marital Property awarded to Wife as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |
| Total Debt allocated to Wife as valued by: | Husband | $ |
| | Wife | $ |
| | Trial Court | $ |

*See* Tenn. Ct. App. R. 7. Husband's table contained none of these totals, and Wife's brief simply adopted the incomplete table provided in Husband's brief.

This Court has repeatedly emphasized the importance of a Rule 7 table:

'[I]t is essential that the parties comply with Rule 7 in order to aid this Court in reviewing the trial court's decision. The table required by Rule 7, allows this Court to easily and correctly determine the valuation and distribution of the marital estate as ordered by the trial court. Further, the Rule 7 table, allows this Court to ascertain the contentions of each party as to the correct valuations and proper distribution, as well as the evidence in the record which the party believes supports its contention. Consequently, a table, in full compliance with Rule 7, is vital as this Court must consider the *entire* distribution of property in order to determine whether the trial court erred. Moreover, this Court is under no duty to minutely search the record for evidence that the trial court's valuations may be incorrect or that the distribution may be improper.'

*Kanski v. Kanski*, No. M2017-01913-COA-R3-CV, 2018 WL 5435402, at *6 (Tenn. Ct. App. Oct. 29, 2018) (quoting *Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010)).

The deficiencies in the Rule 7 table provided to this Court did not impact our ability to address Husband's issues regarding the classification and valuation of the Shelby Drive property, but the omissions directly hinder our ability to review Wife's issue on appeal. "A table that comprehensively lists the trial court's division of a divorced couple's assets is essential because the issue on appeal is 'whether the *overall* property distribution was equitable' not 'whether the division as to *particular assets* was equitable.'" *Blount v. Blount*, No. E2017-00243-COA-R3-CV, 2018 WL 1433198, at *3 (Tenn. Ct. App. Mar. 22, 2018) (quoting *Morton*, 182 S.W.3d at 834) (underlining added, italics in original). As it is, we are left with Wife's vague suggestion that "the trial court's plan was to split [the assets and debts] roughly equally," but after the interest obligation was eliminated, the court was left with "an extremely inequitable division of marital assets." Wife has not demonstrated to this Court any overall totals awarded by the trial court or even percentages of the estate awarded to each party. As a result, we will not conclude that the trial court's overall marital property division was inequitable. *See Kanski*, 2018 WL 5435402, at *6 (explaining that a party who fails to comply with Rule 7 "waives all such issues relating to the rule's requirements"); *Robbins v. Robbins*, No. E2017-01427-COA-R3-CV, 2018 WL 3954323, at *14 (Tenn. Ct. App. Aug. 16, 2018) (deeming marital property issues waived when the husband failed to include a Rule 7 table reflecting the overall division of the marital estate and only itemized certain assets and debts and took issue with each, noting that this Court will not "tweak divisions of marital estate piecemeal"); *Kirby v. Kirby*, No. M2015-01408-COA-R3-CV, 2016 WL

- 22 -

4045035, at *6 (Tenn. Ct. App. July 25, 2016) ("we cannot determine whether the overall distribution of marital property . . . is equitable in the absence of evidence regarding the values of all marital assets and amounts of debts").

### B. Husband's Income

The next issue raised on appeal by Husband and Grandfather is whether the trial court erred when it "determined Husband's income for alimony and child support purposes and in awarding the amount of alimony it awarded to Wife." At the outset, we note that Husband and Grandfather do not cite any caselaw or other legal authority regarding child support or even reference the Tennessee Child Support Guidelines. Consequently, to the extent that they have attempted to challenge the trial court's calculation and imputation of income to Husband for "child support purposes," we deem the issue waived.[9] Again, it is not our role "to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed*, 301 S.W.3d at 615.

Husband and Grandfather do cite general caselaw regarding alimony, but they do not include any analysis of the statutory factors to be considered when awarding alimony or discuss the four types of alimony. Instead, Husband and Grandfather limit their issue to whether the trial court erred "when [it] determined Husband's income for alimony [] purposes and in awarding the amount of alimony it awarded to Wife."

We begin with the issue regarding Husband's income. Husband and Grandfather acknowledge in their brief that "Grandfather had been 'funneling' whatever money he could to his son, Wife[,] and his 4 grandchildren" prior to the divorce. However, they claim that after Wife filed suit against Grandfather and Husband, Grandfather "got upset and terminated what he considered to be gifts and support to Husband and Wife beyond Husband's salary." Husband admittedly continued to receive his salary of around $78,500 per year, and Shelby Railroad continued to pay some expenses on his behalf. However, Grandfather reduced Husband's annual rental payments from Shelby Railroad from $180,000 (equating to $15,000 per month) to a mere $2,400 per year.

In the divorce decree, the trial court acknowledged Grandfather's testimony that he runs Shelby Railroad like a dictatorship and can pay any amount of rent to Husband that he pleases. However, for purposes of computing Husband's income in connection with the issue of alimony, the trial court found it appropriate to look to the amounts

---

[9] The Tennessee Child Support Guidelines provide that imputing gross income to a parent is appropriate in certain specified situations. *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *12 (Tenn. Ct. App. Feb. 23, 2018) (citing Tenn. Comp. R. & Regs. 1240–02–04–.04(3)(a)(2)); *Cain-Swope v. Swope*, 523 S.W.3d 79, 91 (Tenn. Ct. App. 2016).

- 23 -

Husband had been paid historically in addition to the rental value of the real property. The trial court noted the testimony of both parties' real estate appraisers concerning the fair rental value of the property and found the fair rental value calculation used by Husband's appraiser to be more persuasive. Husband's own appraiser estimated the fair rental value of the property at $178,448 per year. Utilizing that figure, the trial court calculated Husband's share of the annual rental income for the property at $89,224, or $7,435 per month. In addition to this rental amount, the trial court considered Husband's annual salary of $78,500 and the value of the various personal expenses Shelby Railroad routinely paid for Husband, as described by Wife's expert witness. The trial court noted that Husband's expert had "no major issues" with the calculations made by Wife's expert. Still, the trial court reduced the figure suggested by Wife's expert somewhat, declining to impute income to Husband based on two categories of expenses paid on his behalf. After making these two deductions, the trial court set Husband's monthly income for purposes of alimony at $15,707.35 (which equates to $188,488.20 per year).

On appeal, Husband argues that the trial court erred in setting his income at $15,707.35 for purposes of determining alimony, although Husband does not suggest any alternative figure that would have been more appropriate. Husband simply suggests that the trial court erred by "imputing to him the rental and other forms of income." Husband apparently believes that the trial court should not have assigned any rental income to him beyond the $2,400 he was currently being paid by Grandfather.

A decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Gonsewski*, 350 S.W.3d at 105. Our role "in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Id.* When making an alimony award, many factors must be considered when relevant to the parties' circumstances, including "[t]he relative earning capacity . . . and financial resources of each party, including income from . . . all [] sources[.]" Tenn. Code Ann. § 36-5-121(i)(1). However, "the two [factors] that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110 (internal quotation omitted). In determining Husband's income and ability to pay, the trial court found it appropriate to consider not only the base salary of $78,500 that Husband was currently receiving but also the *fair rental value* of the Shelby Drive property and the amount of monthly expenses that Shelby Railroad paid for Husband. In light of the circumstances, this decision was certainly reasonable and in accordance with the controlling legal standards. We discern no error in the trial court's conclusion that Husband's monthly income for purposes of determining alimony should be $15,707.35 (or $188,488.20 per year). This is especially reasonable considering that Husband received over $250,000 from Shelby Railroad in salary and rent alone in the three years prior to the divorce (in 2011, 2012, and 2013), not to mention the benefits paid on his behalf.

Next, we consider Husband's assertion that the trial court erred "in awarding the amount of alimony it awarded to Wife." Again, Husband does not suggest that the trial court should have awarded a different *type* of alimony, nor does he suggest that some specific lesser *amount* would have been appropriate. Instead, Husband simply contends that the trial court's ruling was "financially devastating" to him because each month he is ordered to pay $2,719 in alimony in solido (for the Shelby Drive property), $1,500 in alimony in futuro, and $1,332 in child support, in addition to the children's private school tuition, health insurance, and life insurance. Husband suggests that once these expenses are deducted from his imputed monthly income of $15,707.35, he will still owe $3,500 per month in income taxes, leaving him with only $2,658 per month for himself.[10] Husband argues that Wife has "more monthly resources than Husband" if you consider her alimony in solido payment, child support, trust income of $778, and her ability to earn $2,338 per month as estimated by the trial court.

Unlike Husband's analysis of these isolated figures, the trial court separately addressed every statutory factor relevant to an award of alimony and made findings regarding each. In particular, it found that this was a 29-year marriage and that Wife was 52 years old, a homemaker, and the primary caregiver for the parties' four children. It found that Husband has a much greater ability to acquire capital assets and income and that his earning capacity significantly exceeds that of Wife. It estimated Wife's earning capacity as $2,333 per month and noted her trust income of $778 per month, for a total monthly income of $3,111. Husband's estimated monthly income, in comparison, was $15,707.35. Considering these facts and all other relevant factors, including the division of the marital estate, the court determined that Wife is not capable of being rehabilitated within the meaning of the statute and that an award of long term support in the form of alimony in futuro was appropriate. It ordered Husband to pay $1,500 per month in alimony in futuro until the youngest children graduate from high school in 2021, at which time the alimony obligation will increase by the same amount that Husband had been paying in child support, to a total of $2,832 per month until December 2031. Again, trial courts are given broad discretion "to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski*, 350 S.W.3d at 105. We discern no merit in Husband's argument that the trial court abused its discretion in setting this "amount" of alimony.

### C. Attorney's Fees on Appeal

Wife seeks an additional award of alimony in solido for her attorney's fees incurred on appeal. She notes that the trial court required Husband to pay $200,000 of her attorney's fees incurred in the trial court and contends that the same factors justify an award of fees on appeal, as her financial situation has not improved. She suggests that

---

[10] The trial court entered its final order in 2017. Therefore, the deductibility of his alimony is not affected by the new tax law, which takes effect for alimony payments beginning in 2019.

Husband and Grandfather sought an unwarranted appeal and are using their greater financial means "to further punish and attempt to impoverish [Wife]."

"In domestic relations cases, appellate courts can exercise their discretion to award attorney's fees incurred on appeal to the economically disadvantaged spouse as additional support." *Cardle v. Cardle*, No. M2016-00862-COA-R3-CV, 2017 WL 2188534, at *9 (Tenn. Ct. App. May 17, 2017) (citing *Andrews v. Andrews*, 344 S.W.3d 321, 340 (Tenn. Ct. App. 2010); *Brown v. Brown*, No. M2008-00788-COA-R3-CV, 2009 WL 1362307, at *4 (Tenn. Ct. App. May 14, 2009)). We consider "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Stratienko*, 529 S.W.3d at 413 (quoting *Dulin*, 2003 WL 22071454, at *10).

Here, Husband was unsuccessful on appeal in his attempts to challenge the trial court's rulings with respect to the Shelby Drive property and the issues of alimony and child support. However, Wife also raised an issue on appeal regarding the marital property division, and she was likewise unsuccessful. We do not believe that either party pursued these issues in bad faith. Both sides have substantial attorney's fee obligations based on the lengthy proceedings in the trial court. We note that Wife's attorney's fees are almost twice that of Husband's. Litigants should be forewarned that they are ultimately responsible for the payment of their attorney's fees. Although the court may award the prevailing party in a divorce case some or all of their attorney's fees, that result is never certain. Accordingly, it behooves every litigant to be acutely aware of the costs of litigation and to actively participate in deciding what issues are worth litigating.

The trial court ordered Husband to be responsible for his own attorney's fees, which totaled $331,000, in addition to $200,000 of Wife's attorney's fees, which totaled over $649,000. We agree with the trial court's observation that the staggering amount of attorney's fees incurred in this litigation "is one of the saddest issues involved in this case." However, considering the equities between the parties, their respective abilities to pay, and their success (or lack thereof) on appeal, we respectfully decline Wife's request for an additional award of attorney's fees on appeal.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court in all respects. Wife's request for attorney's fees on appeal is denied. Costs of this appeal are taxed equally to the appellants, John Taylor Tarver and John Kirk Tarver, and to the appellee, Sallie Lunn Tarver, for which execution may issue if necessary.

_____
ROBERT E. LEE DAVIES, JUDGE