IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2025 Session

## BRANDON HURST v. JEFFRI HURST (NOW WUTZ)

**Appeal from the Chancery Court for Williamson County**
**No. 23CV-52205     Joseph A. Woodruff, Judge**
———————————————————

**No. M2024-01195-COA-R3-CV**
———————————————————

In this post-divorce action, Husband appeals the trial court's classification of certain property. Because the trial court's order contains conflicting findings, we vacate and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

William P. Holloway, Franklin, Tennessee, for the appellant, Brandon Hurst.

Joanie Abernathy, Franklin, Tennessee, for the appellee, Jeffri Hurst.

## MEMORANDUM OPINION[1]

### I. FACTUAL AND PROCEDURAL BACKGROUND[2]

_____

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] To avoid taxing the length of this Opinion, this section contains only the filings and testimony relevant to the issues raised on appeal.

Plaintiff/Appellant Brandon Hurst ("Husband") and Defendant/Appellee Jeffri Hurst ("Wife") were married in September 2018. Husband filed his complaint for divorce in the Williamson County Chancery Court ("the trial court") on February 13, 2023; Wife filed her answer and countercomplaint for divorce on March 1, 2023. Pursuant to Wife's January 18, 2024 motion and the stipulation of the parties, the trial court entered a final decree of divorce on February 7, 2024. *See* Tenn. Code Ann. § 36-4-129(b) ("The court may, . . . if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone."). All remaining issues were reserved.

The trial court heard proof regarding the division of the marital estate on April 9 and 10, 2024. According to the joint asset and liability statement provided by the parties prior to trial, there was little dispute as to the classification, valuation, and distribution of the majority of the parties' property. Of particular relevance in this appeal is a 2009 Dodge Viper purchased by Husband in September 2020. Husband testified that he paid $25,000.00 in cash and traded two vehicles for the Viper. Husband explained that the $25,000.00 came from a money market account containing only the proceeds from the May 2020 sale of real property he received from his grandmother prior to the marriage. One of the traded vehicles was a Ford F350, which Husband testified was purchased and titled without a formal loan. Husband explained that while he and Wife borrowed money back and forth a lot, he did not believe that Wife loaned him money for the purchase of the truck specifically.

Then, in September 2021, the Viper was listed as collateral for a loan in Wife's name that was used to purchase another vehicle for Husband's benefit. Husband explained that the loan was issued in Wife's name as a result of her higher credit score. Husband testified that the loan on the Viper was still outstanding, but he believed it would be easy for him to pay it off by taking out a loan in his own name. Other than acknowledging that Husband continued to make timely payments on the note during the parties' separation, Wife offered no testimony regarding the vehicle.

However, the bulk of the testimony involved real property owned by Wife prior to the marriage. Wife purchased two lots on Highway 96 West in Franklin, Tennessee, in 2011. The "house lot" comprised 11.5 acres and what became the marital residence; the "barn lot" comprised 10.84 acres and several outbuildings.[3] Marc Headden, an "expert in real estate appraisals," testified to his belief that the property would command a higher market value if sold separately. Mr. Headden provided a valuation of each lot, both current as of July 2023 and retroactive to September 2018, the time of marriage. According to Mr. Headden, the house lot was worth $650,000.00 in September 2018 and $1,160,000.00 in July 2023; the barn lot was worth $475,000.00 in September 2018 and $756,000.00 in July 2023. Although Mr. Headden agreed that improvements made to the farm[4] contributed

---

[3] We will refer to both lots collectively as "the farm" or "the property."
[4] Mr. Headden explained that Husband provided him with a list of improvements made to the

- 2 -

somewhat to its higher valuation, he testified that the majority of the increase resulted from "market appreciation[.]"

Also prior to the marriage, Wife started a horse-boarding business, The Green Barn, LLC ("Green Barn") on the property. Later, but still prior to the marriage, Wife created an off-site pet-sitting business, No Worries Pet Sitting ("No Worries") as a d/b/a of Green Barn. The parties offered differing opinions regarding Husband's contributions to these businesses and the overall upkeep of the property, and regarding the parties' finances.

According to Husband, his efforts, both before and during the marriage, were instrumental to the continued operation and eventual success of Green Barn. Husband testified that he met Wife in mid-2015, shortly before both parties divorced their then-spouses. As the parties became friends, Wife began discussing her property and businesses in more detail. Husband explained that Wife was concerned with her ability to afford the upkeep of the property after her divorce, as well as her lack of hands-on mechanical experience. Because Wife "was not in a real good situation[,]" Husband began completing small projects on the property. At this time, Husband was employed full-time, maintaining a herd of horses on a large plot of land owned by a local church. He also worked part-time with the local fire department.

Husband testified that, as their relationship developed, his projects became more involved and his time on the property more frequent. The parties began a romantic relationship in early 2016, and Husband moved onto the property later that year. Husband testified that, by this time, he was "really helping [Wife] do a lot, sourcing hay and doing a lot of maintenance things," and had "moved more into kind of an official position there." According to Husband, Wife began "representing [him] to others as her . . . business partner of the farm rather than boyfriend or anything like that[.]" His role "was to do all the things that [Wife] didn't or couldn't do as far as maintaining equipment, maintaining the property, dragging the arena, doing a lot of mowing, . . . and fixing [the] entrance to the pastures[.]"

Eventually, Husband explained, the parties "entered into more of a formal understanding where [Husband] was the supervisor of maintenance" and would deal "with maintenance, big projects, big picture things to improve the farm[,]" and the maintenance employees; Wife would primarily deal with the clients and supervise the employees feeding the horses. To accommodate his increased role at the farm, Husband reduced and ultimately ended his employment with the church camp in 2016. Also around this time, Wife began focusing on her pet-sitting company. As part of No Worries, Wife would do longer-term pet sitting from the client's home, requiring her to be gone up to a week at a time. Because the farm did not have any overnight employees, Husband would be tasked

_____

property. While he "did not go through . . . and check off on every single item," Mr. Headden testified that his observation of the property indicated that many of these projects had been completed.

with handling any emergencies that sprang up while Wife was pet sitting.[5]

Husband testified that the conversations about the parties' "big picture plans" continued during the marriage, because they were "thinking of it as a -- not just a business or a working partnership, but a family[.]" He explained that the goal was to "build the business into something that was actually profitable and sustainable long enough that we could sit on the property and then eventually sell the property and take that money and start a new business that was more passive income." Husband testified that "the exact numbers were always kind of a secret" but he believed the business became more profitable as a result of the parties' efforts.

Husband admitted that his name was never added to the farm's title or Wife's bank accounts, that no joint bank accounts were opened by the parties, and that the parties did not file any joint tax returns. Husband explained that he did not pay any property tax or insurance bills for the farm. According to Husband, the farm's business expenses would be paid from the Green Barn account or possibly Wife's personal account. Husband believed the parties' personal household expenses were also paid from the Green Barn account.

Husband further admitted that several improvements made to the property were funded by Wife's insurance policy rather than any contribution by Husband. But Husband explained that he "invested money into projects that went into the farm [and has] done things that have cost [him] money." By way of example, Husband testified that he built up the property's driveway, cleared land for riding trails and additional pastures, ran new electric lines across the property, repainted and revamped several barns, and helped build a hay barn, a grass riding area, and a horse jump area.

Husband denied that the parties came to a definite agreement regarding their finances, explaining that it "was always kind of a point of contention for [them,]" where "[Wife] wanted money" and "[Husband] wanted to be compensated." Husband testified that while he received a paycheck for any work he did for No Worries, he did not receive any direct payment for his work on the farm.[6] While Husband acknowledged Wife's testimony that he was credited $800.00 per month for his work on the farm, he would not agree that such a system remained in place for more than a few months at a time. Nor would Husband agree that this credit would go toward his share of the parties' expenses and $250.00 in rent.[7] Instead, Husband testified that his "compensation would stay in [Wife's]

---

[5] Wife testified that she "only took jobs that were near the farm, and [she] would come back through the day multiple times. [She] was not gone for the way that he made it sound."

[6] Husband testified, however, that it was inaccurate to say that he was not compensated in any way for his work on the farm, as running Green Barn allowed the parties to pay their mortgage and live on the property.

[7] Yet, Husband did agree that when he moved off the property in March 2023, "all of the things that were being covered by [him] working with the farm business, [he] now had to pay separately out of pocket."

bank account and the mortgage would get paid and the bills would get paid, and I was working."[8] Husband explained that he would buy, sell, and trade some of his vehicles when he needed additional money. In June 2020, Husband began a towing company "to be able to bring in a little more income so [he] had a little more freedom[.]"

Although Husband agreed that the farm began as Wife's separate property, he testified that the farm should now be classified as marital property, as the result of transmutation or comingling. Husband explained that he was not asking for the property to be sold. Instead, he requested an award of $680,702.94 to create an equal division of the value of the marital estate. He explained that this amount could come from Wife refinancing or selling the property. In the event the trial court did not find that transmutation or comingling occurred, Husband requested an equal distribution of the farm's $739,725.14 increase in value during the marriage.

Wife offered a markedly different perspective on the parties' professional relationship. According to Wife, at the outset, she "didn't give [Husband] a title. There wasn't a role necessarily." She explained that Husband began staying at the farm at the very beginning of their romantic relationship, and "because he was there all of the time, [] he would just help [] with the horses or watering horses, or [] little projects at the barn." While she agreed that Husband eventually came to oversee maintenance on the farm, Wife explained that Husband "told [her] that that's what he was going to do, and [she] went along with it because [she] pretty much went along with whatever he would say he was going to do." Wife's testimony was that she similarly "went along" with Husband "assert[ing] himself" into a hiring and firing role with Green Barn employees, and listing himself as co-owner of Green Barn on his resume. She admitted, however, that she was not as skilled as Husband in terms of equipment repair and "wheeling and dealing."

Wife was adamant that she did not make Husband her business partner. Wife explained: "I would often say, 'I want us to be partners,' and I would refer to that in life. I was looking for a life partner." Husband received a 1099 tax form for any pet sitting done with No Worries, but did not receive one from Green Barn. She testified that Husband's name was not added to her personal bank account or the account of either Green Barn or No Worries; Husband was also not added to the property title, the Green Barn, LLC documents, or her tax returns. Equipment for use on the farm was purchased using revenue generated from Green Barn and titled in Wife's name. Although Husband was included on the No Worries website, Wife explained that all of her employees were listed. If clients paid Green Barn for work done by Husband individually, Wife would remit the payment to Husband.

---

[8] Husband further testified that he was unsure which bank account the $800.00 per month credit for his work on the farm went into, explaining: "I don't have firsthand knowledge. I would say it would start out in the Green Barn account because [that was] where the revenue was coming in and how she disbursed it from there I have no idea."

At trial, Wife testified that without her work on the farm, she would not own the property any longer. And at her deposition, Wife singled Husband out as the lone Green Barn employee that did not substantially contribute to the maintenance and upkeep of the property. Wife testified that the majority of the improvements to the property Husband described to Mr. Headden were paid for by Wife or her insurance company and completed by hired contractors; Wife had no knowledge of several items on the list and a few items, while technically completed by Husband, were for his own benefit, rather than that of the farm or Green Barn as a business. Various fences and enclosures added to the property by Husband were for the housing of his pet animals; Wife testified that the additions were poorly made and were eventually removed after becoming rundown. Husband's efforts in clearing part of the property created riding trails that went unused and became overgrown, and were in part done to establish a place to house Husband's hogs. Wife testified that Husband's pet animals made a mess of the area of the property they were kept in and Husband's tow trucks resulted in the cracking and breaking of the paved driveway. While Husband added a gravel parking lot on the property partly at his own expense and partly with gravel provided by Wife, this project was initially done against Wife's wishes and only benefited Husband's towing company. Wife explained that Husband had painted the inside of one barn once, but stated that the project was "part of maintenance" and would not have added to the value of the property. While Husband did help re-grade and re-gravel another driveway on the property, Wife's other employees also contributed to the project. According to Wife's testimony, the new electric lines added to the property were only necessary because Husband dug up the existing lines.[9]

Wife further testified that she instituted a system of deducting Husband's share of the household expenses from an $800.00 monthly credit for his work "virtually right at the beginning." Prior to marriage, Wife deducted part of the electric, water, and groceries, animal feed for his pets, and other expenses he incurred from this credit, and Husband would mow the grass, and "little things like that and offer to help [Wife] with the horses sometimes." Wife explained that she would not always charge Husband the full cost of certain household expenses because Husband "would complain and get angry" about the amount spent. During the marriage, Wife deducted $250.00 per month in rent and the premiums on Husband's life insurance in addition to the other expenses. These funds would not leave the Green Barn bank account, from which Wife paid the bills for Green Barn and No Worries before transferring moneys to her personal account to be put toward household expenses. Wife explained that while she initially kept the running list of expenses on a white board, she eventually began keeping the list on her phone; she would then reconcile the list and tell Husband the total approximately monthly. According to Wife, Husband's outstanding balance would occasionally reach $2,000.00 or more, but he would always pay it down.

---

[9] Husband denied both that he caused the damage to the electric line and that the project resulted from the damage, explaining that the damage occurred in the course of running new electric lines across the property.

Wife requested that the farm remain classified as her separate property. She acknowledged that the business bank accounts, as well as the business debts, were also her separate property.

After the hearing, the trial court granted the parties leave to file post-trial memoranda and affidavits of attorney's fees. The trial court then issued its memorandum and order on June 26, 2024. The trial court noted that "Husband's testimony was consistent [with] someone trying to evade questions as opposed to answering fully and truthfully. Husband's testimony lacked candor when pressed about issues that weren't favorable to him. The Court gives minimal weight to Husband's testimony." Conversely, the trial court found that "Wife's testimony was consistent with someone testifying truthfully and credibly. The Court gives great weight to her testimony. Where Wife's testimony and Husband's testimony differs, the Court gives greater weight to Wife's testimony as opposed to Husband's." Finding the parties capable of repaying their respective debts, the trial court declined to award attorney's fees to either party.

Regarding the distribution of the marital estate, the trial court emphasized the short duration of the marriage and the intentional separation of the parties' finances. The trial court found:

> In this case, the parties were married for just under five- and one-half years. Both of the parties are now in good health with potential to make a good living; this is not a case where alimony is sought. Wife's net worth is almost ten times higher than Husband's. Husband's name was never added to the LLCs or bank accounts, and Wife's name was never added to [Husband's towing company] or Husband's bank accounts. The parties filed separate tax returns. Husband was paid for his work on the Farm and for Green Barn as an employee, and he did not provide financial support to Wife's separate property. The parties divided most of their expenses.

(Citations to the record omitted). Comparing the facts of the instant case to those in ***Batson v. Batson***, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988), the trial court noted that it would "aim to put the parties in as close to a pre-marital position as possible." Thus, the trial court classified and distributed the majority of the property as agreed by the parties. The trial court noted that its distribution of the disputed assets was "the fairest for the parties[,]" despite the fact that the value of disputed marital assets was skewed in Wife's favor "due to the large amount of debt that the parties have. Wife is entitled to the accounts, but she is also required to take on the debt as well. Based on the parties' evaluations and testimony, it appears the debts are greater than the assets." Within its distribution of contested marital assets, the trial court awarded Husband the 2009 Dodge Viper;[10] Wife was awarded her

---

[10] Pursuant to Wife's motion to alter or amend, by order of August 6, 2024, the trial court amended

personal and business bank accounts[11] and the Green Barn, LLC.

Turning to the real property, the trial court explained that there was no dispute that the farm was Wife's separate property at the time of marriage, with the parties instead asking only whether the farm became marital property as the result of either transmutation or comingling. The trial court concluded that it had not, "for a variety of reasons[,]" including:

> First, Husband admits that he did not provide any financial investment or contribution to Wife's separate property during the marriage, nor did he make any payments toward the mortgage, the property taxes, the SBA loan, or Wife's income taxes. The parties never had an agreement to treat the Farm as marital property. . . . .
> Second, the parties came into this marriage with the idea that they would keep their property separate. Early on in the marriage, Wife never put Husband's name on bank accounts . . . . The parties never filed joint tax returns. Husband's name was never put on the documents for the Farm or the Green Barn. Husband lived on the Farm with Wife, but the parties kept their finances divided during the entirety of the marriage.
> Third, Husband's contributions were not significant enough to transmute this property. During the time Husband was living on the Farm, he embarked on small projects that added little value, if any, to the Farm. Husband built wire fencing, did minor limb cutting on the trails, and made some parking pads for the trucks in the driveway. This was the extent of Husband's contributions to the Farm value as a piece of real property. Respectfully, Husband's work was the kind that was done, less as a partner in business, but more as a farmhand. The parties' monthly "credit" and "debit" arrangement shows that Wife did not intend to create a business partnership with Husband.
> Finally, Husband was treated as an "employee" of the Green Barn. Husband was given a per-month credit of $800 toward his share of rent, utilities, and a life insurance premium. This was a monthly credit given for the work he did on the Farm and for the Green Barn. It was given to him explicitly for his work.
> For these reasons, the Farm did not transmute into marital property, and it was not comingled.

---

its judgment to also hold Husband responsible for the outstanding loan against the vehicle.
[11] Wife was awarded nine bank accounts, two Venmo accounts, four credit card balances, two accounts associated with lines of credit, one account associated with a small business loan, and one other debt as marital property. Of these, two bank accounts, both Venmo accounts, both lines of credit, and the small business loan were undisputedly issued in the name of Green Barn or No Worries. Only two bank accounts were classified as Wife's separate property, both of which were associated with an inheritance.

Similarly, the trial court concluded that Husband had not substantially contributed to the preservation or appreciation in value of the farm, and so was not entitled to any increase in the property's value.

> The reason why is simple: Husband did not provide a significant amount of improvements to the Farm that would entitle him to a share of the increase. As stated above, the improvements that Husband provided were minimal, and they were almost exclusively for his sole benefit, such as to house his swine or park his tow truck. Wife paid for the improvements to the barn, the fences, and the driveway. Husband provided little support, and the support he did provide is offset by the state of disrepair he left the Farm in when he left in March 2023. Even considering Wife's contributions to the property, the main reason that the property increased in value over the last six years is due almost exclusively to market factors . . . .

Thus, the trial court concluded that the farm was entirely Wife's separate property.[12]

This timely appeal followed.

## II. ISSUES PRESENTED

Husband raises the following issues on appeal, restated slightly from his brief:

I. Whether the trial court abused its discretion in classifying the farm located at 9570 and 9584 as Wife's separate property

>    A. The farm should be classified as marital property due to the commingling of marital and separate assets
>    B. Alternatively, the appreciation of the farm during the marriage should be classified as marital property

>    II. Whether the trial court abused its discretion in classifying Husband's 2009 Dodge Viper as marital property

Wife raises two additional issues: (1) whether the trial court erred in failing to award her attorney's fees and (2) whether this Court should award her appellate attorney's fees.

## III. STANDARD OF REVIEW

---

[12] In summary, as will be discussed, *infra*, the trial court found the real property on which Wife's business was operated to be Wife's separate property, but Wife's business, two business checking accounts, two business Venmo accounts, two business lines of credit, and one small business loan to be marital property.

The Tennessee Supreme Court has explained the applicable standard of review in cases concerning the proper classification and distribution of assets incident to a divorce as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744–45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). It is not the role of an appellate court to "substitute its judgment for that of the trial court." *Mumford v. Mumford*, No. E2002-01338-COA-R3-CV, 2004 WL 483213, at *9 (Tenn. Ct. App. Mar. 12, 2004) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). Instead, our role is simply to "determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in [Tennessee Code Annotated section] 36-4-121(c) is consistent with logic and reason, and whether the evidence preponderates against the trial court's division of the marital property." *Farnham v. Farnham*, 323 S.W.3d 129, 141 (Tenn. Ct. App. 2009) (citations omitted).

## IV. ANALYSIS

### A. Division of the Marital Estate

In Tennessee, the division of a marital estate is essentially a three-step process. The trial court (1) "must first identify all of the assets possessed by the divorcing parties as either separate property or marital property"; (2) then "value the marital property"; and

finally, (3) "equitably divide the marital property in accordance with the factors provided in Tennessee Code Annotated section 36-4-121(c), because 'following this approach generally yields consistent and equitable results.'" ***Snapp v. Snapp***, No. E2023-00251-COA-R3-CV, 2024 WL 3221027, at \*3 (Tenn. Ct. App. June 28, 2024) (quoting ***Melvin v. Johnson-Melvin***, No. M2004-02106-COA-R3-CV, 2006 WL 1132042, at \*10 (Tenn. Ct. App. Apr. 27, 2006) (Koch, J., dissenting)).

Here, Husband takes issue with the trial court's classification of the farm as Wife's separate property and the 2009 Dodge Viper as marital property. The classification of property as either separate or marital is a question of fact. ***Id.*** (citing ***Cutsinger v. Cutsinger***, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995)). Determining whether an asset is separate property or marital property "is an important threshold matter because courts do not have the authority to make a distribution of separate property." ***Summer v. Summer***, 296 S.W.3d 57, 60 (Tenn. Ct. App. 2008).

Tennessee Code Annotated section 36-4-121 defines the separate property of divorcing parties as including, inter alia,

> (A) All real and personal property owned by a spouse before marriage . . . ;
> (B) Property acquired in exchange for property acquired before the marriage; [and]
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)([2])[.][13]

Tenn. Code Ann. § 36-4-121(b)(4). Conversely, marital property includes all real and personal property acquired during the marriage. Tenn. Code Ann. § 36-4-141(b)(2)(A). Marital property also includes, inter alia, "income from, and any increase in the value during the marriage of property determined to be separate property in accordance with subdivision (b)(4) if each party substantially contributed to its preservation and appreciation[.]" Tenn. Code Ann. § 36-4-121(b)(2)(B)(i). "Substantial contribution" in this context "may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine[.]" Tenn. Code Ann. § 36-4-121(b)(2)(D).

---

[13] Subsection (b)(4)(C) actually references subsection (b)(1), which currently defines "marital debt." Prior to a 2022 amendment to section 36-4-121, however, subsection (b)(1) defined "marital property." In 2022, two new subsections were added to subsection (b) to define both marital debt and separate debt. Because the Tennessee General Assembly did not specify where in subsection (b) to place these new provisions, it appears that the compiler placed these new definitions in alphabetical order, with "debt" coming before "property," and moved the previous subsection (b)(1) to subsection (b)(2). *See* 2022 Tenn. Laws Pub. Ch. 762 (S.B. 2385), *eff.* (March 31, 2022). Nothing in the 2022 amendment indicates that the General Assembly intended to materially change our understanding of subsection (b)(4)(C).

Despite agreeing that Wife owned both lots comprising the farm prior to marriage, Husband argues that the trial court erred in classifying the farm as solely Wife's separate property at the time of divorce. Specifically, "Husband submits that comingling occurred when, over the course of the marriage, the parties made improvements to [t]he [f]arm and paid the mortgage on [t]he [f]arm with marital income."

We begin with a review of the doctrines by which separate property may be converted into marital property. As our supreme court has noted,

> [S]eparate property becomes marital property [by comingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (alteration in original) (citations omitted). Although distinct doctrines, comingling and transmutation are related and often discussed concomitantly. *See, e.g.*, **Snodgrass**, 295 S.W.3d at 256 (quoting *Langschmidt*'s explanation of "the related doctrines of comingling and transmutation"); ***Hill v. Hill***, 682 S.W.3d 184 (Tenn. Ct. App. 2023) (reviewing the trial court's conclusion that the marital residence became marital property through "transmutation and/or comingling"), *appeal denied* (Oct. 13, 2023).

Husband does not dispute the trial court's finding that the farm was not transmuted into marital property. Instead, Husband offers a two-step analysis in his argument that the farm became marital property through comingling. First, Husband argues that the separate property funds in Wife's bank accounts and Green Barn's bank accounts were comingled with marital property. Although Husband was loath to admit at trial that he received any financial compensation for his work on the farm, he emphasizes that the notional $800.00 he was credited each month constitutes marital property as property acquired during the marriage. Rather than being disbursed to Husband, this income remained in Green Barn's bank accounts, which contained pre-marital balances and all revenue brought in by the business during the marriage. Any profits would then be transferred into Wife's personal bank accounts, which also contained pre-marital balances. Therefore, Husband argues the funds in these accounts became inextricably mingled, causing the accounts to be converted

- 12 -

into wholly marital property. Husband then highlights the fact that improvements to the property and "all payments for the household, including the mortgage, taxes and insurance on [t]he [f]arm" were made from these accounts. As such, he argues that "it is impossible to separate the separate property and marital property equity" in the farm. Accordingly, Husband argues that the farm was converted into marital property through comingling.[14]

In determining that neither transmutation nor comingling of the farm occurred, the trial court relied on a few key findings. The trial court emphasized both that the parties intended prior to marriage to keep their property separate and that the parties did, in fact, keep "their finances divided during the entirety of the marriage." The trial court also stressed that Husband made only minimal physical contributions to the property and all of the improvements to the property were paid for by Wife. These findings were bolstered by Husband's admission that he had not provided any financial contribution to Wife's separate property, nor any payments toward the mortgage, property taxes, other business expenses, or Wife's income taxes.[15] Furthermore, we note that many of the relevant findings were made despite testimony by Husband to the contrary, as a result of the trial court's assessment of the parties' credibility. Factual findings based on such credibility determinations are accorded "considerable deference" on appeal. *In re M.L.P.*, 228 S.W.3d at 143. Our review of the record reveals no reason to second guess the trial court's appraisal of Husband's credibility. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.").

Yet, our analysis of the classification of the farm is impacted by Wife's personal and business bank accounts, and the Green Barn, LLC itself, being awarded to her as part of the marital estate, rather than as her separate property. In our view, including these accounts in the marital estate is inconsistent with the trial court's repeated findings that the parties made good on their intention to keep their finances separate, that Wife alone paid for the improvements to the property, and that Husband did not financially contribute to the farm. Moreover, finding these accounts to be marital property is in direct conflict with the trial court's previous rulings that (1) the farm did not become marital property, and (2) Husband did not substantially contribute to the preservation or appreciation of the farm. *See* Tenn. Code Ann. § 36-4-121(b)(4)(C) (providing that income from and appreciation of a spouse's separate property remains separate unless both spouses substantially contribute to the property's preservation and appreciation). In essence, it is certainly arguable that marital property (the accounts) being used to pay the farm's expenses could result in at least some portion of the farm's value being rendered marital. *See Wilson v.*

---

[14] A similar argument has previously been used to support a finding that separate property was transmuted into marital property. *See Lewis v. Lewis*, No. W2019-00542-COA-R3-CV, 2020 WL 4668091, at *4 (Tenn. Ct. App. Aug. 11, 2020) (collecting cases).

[15] The trial court's determination that Husband did not offer substantial physical or financial contributions to the appreciation of the farm also formed the basis of its determination that Husband was not entitled to any share of the farm's increase in value.

*Moore*, 929 S.W.2d 367 (Tenn. Ct. App. 1996) (finding the bank accounts the husband opened during the marriage to be his separate property when they contained only the proceeds from his separate property, but finding the increase in value of the husband's pre-marital retirement account to be marital property when the appreciation came from deposits of his marital property income). The trial court, however, had expressly rejected this result.

But the trial court offers no explanation for these fairly incongruent awards. *Cf.* ***Lovlace v. Copley***, 418 S.W.3d 1, 34 (Tenn. 2013) (noting that a trial court's detailed findings of fact and conclusions of law "facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." (citing ***Est. of Bucy v. McElroy***, No. W2012-02317-COA-R3-CV, 2013 WL 1798911, at *3–4 (Tenn. Ct. App. Apr. 26, 2013))). Although the trial court includes a footnote that its distribution of the disputed marital assets "includes some items upon which the parties can agree on as to the distribution[,]" this offers little clarity. To be sure, the parties agreed as to the value of the accounts and that Wife should ultimately retain them, disagreeing only as to their proper classification. Because there is no dispute that all of the maintenance and renovation of the property was funded by the monies in these accounts, whether those monies were marital or separate property impacts the classification of the farm as a whole. *See* ***Lewis***, 2020 WL 4668091, at *4 (finding "the use of marital funds for improving property or paying off an encumbrance" persuasive to its finding of transmutation). Yet we are left without any indication that the trial court considered the implications of its ruling.[16]

Trial courts speak through their orders and judgments, often doing so "as clearly through implication as they do through express statements." ***Morgan Keegan & Co. v. Smythe***, 401 S.W.3d 595, 608 (Tenn. 2013). When construing orders and judgments, "effect must be given to that which is clearly implied, as well as to that which is expressly stated." ***Id.*** (citations omitted). With the trial court finding that the farm was separate property but Wife's personal bank account and the accounts associated with her pre-marital businesses were marital property, we are therefore left to effectuate both an explicit ruling that the farm remained Wife's separate property and an unexplained implicit ruling that would suggest the opposite.

This is an especially complicated predicament here, where the conflicting rulings both involve a question of fact. ***Owens v. Owens***, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007) ("Questions regarding the classification of property as either marital or separate . . . are inherently factual."). We are wary that an attempt to resolve the apparent inconsistency of these decisions, which carry great weight on appeal, would instead become an impermissible substitution of our judgment for that of the trial court. *See* ***Eldridge***, 42

---

[16] Indeed, it is clear that not even the parties are aware of the repercussions of the trial court's classification of these assets. Rather than simply rely on the trial court's findings that the accounts used to finance all of the farm's expenses were marital property, Husband spends the majority of his brief on his argument that the funds in these accounts had, in fact, been comingled into marital property.

S.W.3d at 85. Thus, we find the best course of action is to vacate the trial court's order as to the classification and distribution of the parties' property and remand this matter for the entry of a cohesive judgment. *See Lovlace*, 418 S.W.3d at 36. This ruling pretermits Husband's remaining appellate issues as to the classification of the appreciation of the farm and the 2009 Dodge Viper, which may be affected by the trial court's ruling on remand. *See Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998) ("The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues.").

## B. Wife's Attorney's Fees at Trial

Wife argues that she should have been awarded her attorney's fees at trial. In the context of a divorce case, the award of attorney's fees constitutes alimony in solido. *See* Tenn. Code Ann. § 36-5-121(h)(1)(B) ("Alimony in solido may be awarded for attorney fees and expenses . . . ."); *Trezevant v. Trezevant*, 568 S.W.3d 595, 624 (Tenn. Ct. App. 2018) (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011)). Among those factors relevant to an award of attorney's fees as alimony in solido, courts must consider both "[t]he separate assets of each party, both real and personal, tangible and intangible" and "[t]he provisions made with regard to the marital property[.]" Tenn. Code Ann. § 36-5-121(i)(7)–(8); *see also Trezevant*, 568 S.W.3d at 624 (noting that "the trial court may award spousal support only after the court has equitably divided the parties' marital property"). As we have determined that the trial court's classification and division of the marital estate must be vacated, so too must the trial court's decision denying Wife her attorney's fees be vacated and remanded for reconsideration after those issues are settled.

## C. Wife's Attorney's Fees on Appeal

Wife also requests her attorney's fees in relation to this appeal, a decision within our discretion. *See Trezevant*, 568 S.W.3d at 641. In light of the outcome of this appeal, we respectfully decline to award Wife her appellate attorney's fees.

## V. CONCLUSION

The judgment of the Williamson County Chancery Court is vacated, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Brandon Hurst and one-half to Appellee Jeffri Hurst, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE